THE MILL, Plaintiff–Appellant and Cross–Appellee,

v.

STATE of Colorado, DEPARTMENT OF HEALTH, Defendant–Appellee and Cross–Appellant.

Nos. 87CA0502, 87CA0838.

Colorado Court of Appeals,
Div. II.

Aug. 17, 1989.

Rehearing Denied Sept. 21, 1989.

Certiorari Granted Feb. 12, 1990.

---

* Sitting by assignment of the Chief Justice under provisions of the Colo. Const., art. VI, Sec. 5(3),

and § 24–51–1105, C.R.S. (1988 Repl.Vol. 10B).

Holley, Albertson & Polk, P.C., George Alan Holley and Eric E. Torgersen, Golden, for plaintiff-appellant and cross-appellee.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., and Jerry W. Goad, First Asst. Atty. Gen., Denver, for defendant-appellee and cross-appellant.

Opinion by Judge SMITH.

The plaintiff, (the Mill) appeals the trial court's order dismissing its claim in inverse condemnation against the Department of Health (the State). Both parties appeal from a judgment entered by the trial court which awarded the Mill $200,000 as damages for what the court, in essence, determined to be a temporary regulatory "taking." Both appeals have been consolidated. We reverse the order of the trial court dismissing the Mill's claim in inverse condemnation and vacate the judgment entered on the Mill's remaining claims.

The Mill is the owner of a sixty-one acre parcel of property which is essentially divided into two parts: The mill yard (25 acres), which is the parcel of major concern here, and the tailings pile (35 acres). The property operated as a uranium and ura-

nium mill tailings disposal site in the late 1950s and until 1962. This activity left the property and the buildings and equipment located on the property contaminated with radioactive material.

Milling operations were originally conducted pursuant to a license issued by the Atomic Energy Commission (AEC) which, after milling operations ceased, was reissued to permit only the storage on the property of past mill tailing products and contaminated equipment and buildings. The permit was again amended in 1968 to allow the transfer of decontaminated equipment. Also in 1968, the State was delegated authority by the AEC to regulate radioactive materials formerly under the jurisdiction of the AEC and the State thus obtained regulatory jurisdiction over the property and the license.

In 1971, after the then-owner of the property completed a decontamination process of the mill yard equipment and building, the State terminated the license and the mill yard was thus authorized for unrestricted use.

In 1973, the Mill reviewed the State's records and discovered the information regarding the 1971 decontamination and license termination. Relying on such information, and believing the mill yard parcel was safe and its use unrestricted, the Mill purchased the entire property.

In 1978, due to the growing awareness of the potential hazards presented by uranium mill tailings, Congress passed the Uranium Mill Tailings Radiation Control Act (UMTRCA) 42 U.S.C. §§ 7901 to 7942 (1978). The purpose of the act was to decontaminate specific uranium processing sites in order to protect the public health from the hazards of uranium contamination. All 61 acres acquired by the Mill were designated under UMTRCA as a "Processing Site," eligible for remedial action under that act and in 1981, the Mill and the Department of Energy (DOE) entered into a limited agreement, permitting DOE to test the tailings pile. However, testing was ultimately performed on all 61 acres and contamination of the mill yard was confirmed in 1982.

In 1983, the Mill leased the entire 61 acres to O.C. Coal Company, primarily for the storage of coal, at a rental of $7,000 per month. The Mill subsequently notified the State of the lease and in response, the State began issuing the Mill a series of restrictive letters and communications. These restrictions included: limiting use of the Mill building to only those portions covered by concrete pads; otherwise limiting use until certain improvements had been made by the Mill; prohibiting any storage of coal without express authorization of the State; and restricting the Mill from use of any portion of the mill yard outside the building to a 50 foot strip along the edge of the property.

These restrictions directly impacted the Mill's lease with the coal company which consequently terminated the lease in 1984. Since then, the Mill has earned only approximately $500 to $700 a month from the mill yard based upon 20% building use.

Alleging that based on the state's restrictions, the property could not be put to any reasonable economic use, the Mill filed a complaint in January of 1986 alleging three claims for relief: Inverse condemnation; a regulatory taking; and estoppel of the State to deny them use of their property. The State filed its answer in April, and in June, filed a motion to require an election of remedies. In response to the motion for election of remedies, the trial court ordered briefs on the State's authority to condemn. Thereafter, in February 1987, the trial court dismissed the Mill's claim in inverse condemnation.

A trial was subsequently held on the Mill's remaining claims and the trial court ruled that the State had so diminished Mill's right to use its property as to constitute a "regulatory" taking of the Mill's property. Measuring damages in terms of "loss of use" over a several-year period, the trial court awarded the Mill $200,000.

I.

The Mill initially contends that the trial court erred in dismissing its claim in inverse condemnation. We agree.

The Mill argues that the trial court improperly concluded that the government activity on which the claim of inverse condemnation was based "occurred" prior to May 16, 1986, the date on which, by legislation, the State was expressly granted the power of eminent domain in such cases.

When reviewing the propriety of a dismissal on the pleadings, we must consider the allegations in the Mill's complaint as true. *Abts v. Board of Education*, 622 P.2d 518 (Colo.1980).

The Mill has alleged in support of its claim in inverse condemnation that, in 1971, the department delicensed the property, thus sanctioning its unrestricted use and that, the Mill relied on the property's delicensed status when it purchased the property in 1973. The Mill further alleges that upon notifying the State that the property had been leased to O.C. Coal Company for retail coal sales operations, the State imposed numerous restrictions and conditions upon the lessee's use of the property so that the property could not be used as originally intended under the lease. They also allege that the State's restrictions effectively preclude *any* viable economic use of the property. Finally, the Mill alleges that under the UMTRCA program, the State has the power of eminent domain and that the State has, in effect, taken possession of, or condemned, the property without having paid the Mill just compensation.

■ In order to proceed in inverse condemnation, that is, to compel the State to exercise its power of eminent domain, the plaintiff must establish that: (1) There has been a taking or damaging of the property (2) for a public purpose without just compensation, (3) by a governmental or public entity which has the power of eminent domain but which has refused to exercise it. *Jorgenson v. City of Aurora*, 767 P.2d 756 (Colo.App.1988). *See also Kratzenstein v. Board of County Commissioners,* 674 P.2d 1009 (Colo.App.1983).

Here, the trial court, after rejecting the Mill's contention that the taking alleged was a continuous and reoccurring event, determined that at the time the taking occurred, the State lacked the power of eminent domain and thus, the claim of inverse condemnation must fail as a matter of law.

■ It is well settled in Colorado that there can be no inverse condemnation in a situation where no right exists in a government agency to proceed under eminent domain. *Game and Fish Commission v. Farmers' Irrigation Company*, 162 Colo. 301, 426 P.2d 562 (1967). Moreover, because the power of eminent domain is vested in the State, the delegation of such authority to a subdivision of the State must be clearly expressed through legislation. *Board of County Commissioners v. Intermountain Rural Electric Association*, 655 P.2d 831 (Colo.1983).

The State's participation in UMTRCA is expressly authorized pursuant to § 25–11–303(1), C.R.S. (1988 Cum.Supp.). Subsection (1)(d) of this section specifically governs the manner in which the State may acquire property which has been designated by the federal act for cleanup.

In 1979, the General Assembly authorized the Department to "acquire and dispose" of designated processing sites. Moreover, in May 1986, this statutory provision was expanded specifically to authorize the Department to acquire such property by condemnation in accordance with the provisions of § 38–1–101, et seq., C.R.S. (1982 Repl.Vol. 16A) and § 24–56–117, C.R.S. (1988 Repl.Vol. 10B).

Because it is undisputed here that after May 16, 1986, the State clearly possessed the right to condemn and, that the Mill's complaint preceded this date, the issue presented is whether the "taking" which triggered the lawsuit was completed on that date, or is a continuing one which merely commenced when the regulations exceeded reasonable police power regulation and continues until such time as the regulations are removed or just compensation is paid and the title transfers.

"A 'taking' is constitutional law's expression for any sort of publicly inflicted private injury for which the Constitution requires payment of compensation." Michelman, *Property Utility and Fairness Commentaries on the Ethical Foundations of*

*"Just Compensation" Law,* 80 Harv.L. Rev. 1165, (1967).

Unlike a taking based on a physical appropriation, where the injury and the date the injury was incurred are relatively easy to identify, a regulatory taking under an exercise of the State's police power is more difficult to define. *See Goldblatt v. Town of Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). *See also Board of County Commissioners v. Flickinger,* 687 P.2d 975 (Colo.1984). ("What constitutes a taking has proved to be a problem of considerable difficulty.... There is no set formula for determining when justice and fairness require economic injuries caused by public action be compensated by the government....")

Nonetheless, the nature of regulatory restriction and the purpose of the just compensation clause of U.S. Const.Amend. V and Colo. Const. art. II § 15 guide our analysis of this issue.

Regulations are, by their very nature, three dimensional: they have depth, width, and length. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California,* 482 U.S. 304, 322, 107 S.Ct. 2378, 2389, 96 L.Ed.2d 250, 268 (1987) (holding that "temporary takings" are compensable). Thus, a regulation's prohibitory or confiscatory effect is a reflection of not only the severity and scope of the government's regulation on use, but also the repetitive and prolonged restriction on use which is embodied in the regulatory scheme.

■ Consequently, once government's restrictions on use are of such magnitude as to substantially impair the owner's use of the property, the date of the injury or taking cannot be determined without consideration of the essential factor of the regulation's duration.

We believe the trial court, in concluding that the taking "occurred" prior to May, 1986, ignored this unique characteristic of regulations. To date, the Mill's property remains contaminated and the restrictions on use due to the contamination allegedly continue to preclude all viable economic use of the property. Thus, quite clearly, there exists today the same injury, the same taking, which was alleged in the Mill's complaint in January, 1986.

■ Consequently, we hold that where, as here, the regulatory restrictions are applied repeatedly and continually, the private injury and thus the "taking" continues to "occur" until such time as the regulations are removed or just compensation is paid.

We believe this interpretation is consistent with the constitutional guarantee on which an action in inverse condemnation is based. *See* U.S. Const.Amend. V and Colo. Const. art. II, § 15. The purpose of these provisions is not to preclude the government's interference with property rights but to secure *compensation* in the event of otherwise proper interference amounting to a "taking." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California, supra.*

■ Where, as here, the State obtained the express power of eminent domain within a few months of the time the Mill filed its complaint and long before the case came to trial, the singular purpose of the constitutional provisions would be severely diminished were we to conclude, as did the trial court, that the taking alleged by the Mill was limited to a specific date which occurred prior to the May 16, 1986 amendment which expressly authorized the State's power of eminent domain.

Accordingly, we conclude that because the "taking" which triggered the Mill's condemnation claim continues and the State possesses the right to condemn, the Mill has sufficiently alleged the legal basis and facts, which, if proven, would establish all of the elements of inverse condemnation. Therefore, the trial court erred in not allowing the Mill to either present its claim of inverse condemnation or, in not allowing the Mill leave to amend its complaint to specifically allege a continuing taking beyond May 16, 1986.

## II.

Based on our disposition of the Mill's appeal of the trial court's order dismissing

its claim in inverse condemnation, we decline to address the Mill's remaining issues on appeal or the issues raised by the State in its cross-appeal as these relate to the alternative claims that resulted in the compensatory judgment entered by the trial court.

The State, however, has raised certain defenses which it alleges, as a matter of law, preclude the Mill's right to bring this action.

■ Inverse condemnation actions, grounded in Colo. Const. art. II, § 15, are to be treated as eminent domain proceedings. *Jorgenson v. City of Aurora, supra,* and are subject to § 24–56–116, C.R.S. (1988 Repl.Vol. 10B). Neither exhaustion of administrative remedies or notice of claims are conditions precedent to maintaining an action under § 38–1–101, et seq., C.R.S. (1982 Repl.Vol. 16A). Similarly, Colo. Const. art. II § 15 creates an exception to the State's sovereign immunity from liability for damages. *See Board of County Commissioners v. Atler,* 69 Colo. 290, 194 P. 621 (1920). Thus, these defenses are not available to the State in relation to the inverse condemnation claim.

The order dismissing the Mill's claim for relief in inverse condemnation is reversed and the cause is remanded with directions to the trial court to reinstate that claim and for further proceedings thereon. In light of this holding, the judgment previously entered on the Mill's other claims is vacated since the issues involved therein, such as damages as a result of excessive regulation and estoppel, are subsumed in the inverse condemnation claim.

PLANK and HUME, JJ., concur.