STATE of Colorado, DEPARTMENT
OF HEALTH, Petitioner,

v.

THE MILL, a limited
partnership, Respondent.

No. 89SC575.

Supreme Court of Colorado,
En Banc.

April 8, 1991.

Rehearing Denied May 6, 1991.

Gale A. Norton, Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Jerry W. Goad, First Asst. Atty. Gen., Natural Resources Section, Denver, for petitioner.

Thomas Fenton Smith, Pitkin County Atty., Aspen, and Marion A. Brewer, General Counsel, Colorado Counties, Inc., Denver, for amicus curiae Colorado Counties, Inc.

George Alan Holley, Eric E. Torgersen, Holley, Albertson & Polk, P.C., Golden, for respondent.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to review *The Mill v. State*, 787 P.2d 176 (Colo.Ct.App.1989). We conclude that the court of appeals erred in holding, first, that the owner of a uranium-contaminated mill site could bring an inverse condemnation action against a state agency which had no condemnation authority, and, second, that the owner's claims for regulatory taking and promissory estoppel were subsumed in the inverse condemnation claim. We reverse and remand to the court of appeals for further proceedings consistent with this opinion.

I.

This case primarily involves a twenty-five acre portion (the "mill yard") of a parcel of property owned by the respondent, The Mill. The property is adjacent to the Gunnison, Colorado airport and through the 1950s and until 1962, the entire property was used for uranium milling operations. In 1968, the State of Colorado obtained regulatory jurisdiction from the federal government for abandoned uranium mills and tailings piles and reposed that authority in the Colorado State Department of Health ("CSDH"). Colorado Ventures, which had purchased the property in 1964, performed a radiation decontamination process on the mill yard and, in 1971, CSDH authorized the mill yard for unrestricted use. The Mill purchased the property in 1973, relying on the State's certification that the mill yard was free from contamination and safe for unrestricted use.[1]

In 1978, Congress passed the Uranium Mill Tailings Radiation Control Act (UMTRCA), 42 U.S.C. §§ 7901–7942 (1978). The purposes of UMTRCA included decontamination of specific uranium processing sites and protection of the public from the hazards of uranium contamination. 42 U.S.C. § 7901. Under UMTRCA the entire property owned by The Mill was designated as

---

1. At the time of purchase, The Mill knew that the remainder of the property was contam- inated and that its use was restricted.

a "processing site" and was eligible for remedial action. The Colorado legislature empowered CSDH to participate in UMTRCA in 1979. Ch. 269, sec. 1, § 25–11–303(1), 1979 Colo.Sess.Laws 1069; § 25–11–303(1), 11 C.R.S (1982).

In January 1983, The Mill leased the entire property to O.C. Coal Company at a rate of $7,000 per month. After The Mill notified CSDH of the lease, CSDH responded by issuing a series of letters and communications restricting use of the property. The restrictions included: limiting coal storage in a building on the mill yard to those portions of the building floor covered by concrete; restricting use of the exterior part of the mill yard to a 50–foot strip along the boundary of the property; prohibiting the building of new structures. A radiation survey performed in October 1983 showed that the soil on the mill yard contained levels of radiation in excess of acceptable exposure levels as set by CSDH and the Environmental Protection Agency. The restrictions placed on the property by CSDH directly impacted The Mill's lease agreement and O.C. Coal terminated the lease in 1984. Since the termination of the lease, the total yearly rental income from the property has been less than the amount which The Mill has paid as property taxes (approximately $5,100 per year). The trial court stated that it did not believe the property had "any value at all."

The Mill filed this action in January 1986, seeking to recover on theories of inverse condemnation, regulatory taking, and promissory estoppel. The Mill alleged that as a result of the restrictions which CSDH placed upon the property, The Mill was precluded from putting the property to any viable economic use. CSDH was expressly granted authority to condemn under the Radiation Control Act, Ch. 195, sec. 1, § 25–11–303(1)(d)(III), 1986 Colo.Sess.Laws 980, 980–81; § 25–11–303(1)(d)(III), 11A C.R.S. (1989), in May 1986. The trial court dismissed The Mill's inverse condemnation

claim on the ground that CSDH did not have authority to condemn at the time of the alleged taking.

The trial court concluded that the State's restrictions on The Mill's property constituted a taking and awarded The Mill $200,-000 based on loss of use of the mill yard. It was expected at the time of trial that the property would be cleaned under UMTRCA and restored to full use. Thus, the trial court awarded loss of use damages from May 1984, when O.C. Coal terminated its lease, through 1993, when the trial court estimated clean-up operations would be completed and use of the property would be restored.[2] CSDH since has sought to condemn the entire property and that proceeding is pending. The stipulated value of the property in the condemnation proceeding was $0.

The State appealed the judgment on the grounds that the claim was not ripe, The Mill had not been deprived of all use of its property, and that even if The Mill had been deprived of all use of its property, the deprivation was a valid exercise of police power and therefore was not compensable. The Mill cross-appealed, arguing that the dismissal of the inverse condemnation claim was not proper because the State was taking its property on a reoccurring basis. The court of appeals reversed the trial court's dismissal of the inverse condemnation claim on the basis that CSDH's actions constituted a continuous taking. *The Mill,* 787 P.2d at 180. The court of appeals also held that all other claims and defenses were subsumed in the inverse condemnation claim. *Id.* at 181. Accordingly, the court of appeals did not address any other issues and remanded the case to the trial court for resolution of The Mill's inverse condemnation claim. *Id.*

We granted certiorari on the following two issues:

Did the court of appeals err when it ruled that there may be a "continuous"

---

**2.** This was the proper measure of damages under the facts as understood at the time. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 319, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987) (in

the case of a temporary regulatory taking, "the Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land during [the taking]").

taking in an inverse condemnation action?

Did the court of appeals err in merging all claims and defenses into a single inverse condemnation claim, thus barring defenses otherwise available?

We hold that there can be no continuous taking in an inverse condemnation action and also hold that the court of appeals erred in merging all claims and defenses into The Mill's inverse condemnation claim.

## II.

■ The Colorado and United States Constitutions forbid the taking of private property without just compensation. U.S. Const. amend. V;[3] Colo. Const. art. II, § 15. Inverse condemnation is "a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *United States v. Clarke*, 445 U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373 (1980).

■ The following proposition, however, is well-settled in Colorado:

Where there is no power on the part of a state agency to condemn private property for a claimed public use, a property owner whose property has been damaged by such agency cannot be held to have commenced an action for "inverse condemnation" when he seeks to recover the damages actually sustained by him. There can be no "inverse condemnation" in a situation where no right exists in the governmental agency to proceed under eminent domain.

*Collopy v. Wildlife Comm'n*, 625 P.2d 994, 1005 (Colo.1981) (quoting *Game and Fish Comm'n v. Farmers Irrigation Co.*, 162 Colo. 301, 310, 426 P.2d 562, 566 (1967)). *See also* J. Sackman, *Nichols on Eminent Domain*, § 8.1[4] ("The remedy of inverse condemnation, by the very premise which gives rise to it, is available only as against defendants who possess the power of eminent domain."). *But see Fountain v. Met-*

*ropolitan Atlanta Rapid Transit Auth.*, 678 F.2d 1038, 1043–44 (11th Cir.1982) ("If official authorities act on behalf of the state so as to take private property for public use without just compensation, even if they are acting outside of the scope of their official powers, they have violated the fifth and fourteenth amendments [of the United States Constitution] and are subject to an inverse condemnation suit. As long as the state acts through one of its arms in such a way as to deprive an individual of his property for public use, it is irrelevant whether the state arm doing the actual taking has eminent domain power.") (citation omitted).

■ The Mill contends that CSDH was given the power of eminent domain by the 1979 statute empowering CSDH to participate in UMTRCA. We disagree. We have adopted the following analysis for determining whether an authority has been given the power of eminent domain:

The authority to condemn must be expressly given or necessarily implied. The exercise of the power being against common right, it cannot be implied or inferred from vague or doubtful language.... If the act is silent on the subject, and the powers given by it can be exercised without resort to condemnation, it is presumed that the legislature intended that the property should be acquired by contract.

*Board of County Comm'rs v. Intermountain Rural Electric Ass'n*, 655 P.2d 831, 834 (Colo.1982) (quoting *Mack v. Town of Craig*, 68 Colo. 337, 338–39, 191 P. 101 (1920)). In addition, we have held that the power to "acquire land ..., by purchase or otherwise," did not confer authority to condemn. *Town of Eaton v. Bouslog*, 133 Colo. 130, 132, 292 P.2d 343, 344 (1956).

The 1979 statute authorized CSDH to "acquire and dispose of any designated processing site, including any interest in such site, and any site to be used for the permanent disposition and stabilization of residu-

3. The Fifth Amendment applies to the states through the Fourteenth Amendment. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 310 n. 4, 107 S.Ct. 2378, 2383 n. 4, 96 L.Ed.2d 250 (1987). *See also Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

al radioactive materials." Ch. 269, sec. 1, § 25–11–303(1)(d), 1979 Colo.Sess.Laws 1069, 1070; § 25–11–303(1)(d), 11 C.R.S. (1982). The 1986 amendment to the statute explicitly authorized CSDH to obtain property through condemnation proceedings. Ch. 195, sec. 1, § 25–11–303(1)(d)(III), 1986 Colo.Sess.Laws 980, 981; § 25–11–303(1)(d)(III), 11A C.R.S. (1989).

Under the above authorities, the 1979 statute did not confer on CSDH the power of eminent domain. The 1979 statute merely gave CSDH the power to "acquire" property. It contained no mention of any authority on the part of CSDH to condemn. We therefore conclude that CSDH was not authorized to acquire property through condemnation until section 25–11–303 was amended in 1986 to expressly confer this condemnation power.

■ The court of appeals reinstated The Mill's inverse condemnation claim on the theory that the regulatory taking continued through May 1986, when CSDH expressly obtained the power to condemn.[4] The court of appeals formulated the issue as follows:

> [T]he issue presented is whether the "taking" which triggered the lawsuit was completed [before May 1986, when CSDH expressly was given the power of eminent domain], or is a continuing one which merely commenced when the regulations exceeded reasonable police power regulation and continues until such time as the regulations are removed or just compensation is paid and the title transfers.

*The Mill,* 787 P.2d at 179. The court of appeals reasoned:

> [O]nce government's restrictions on use are of such magnitude as to substantially impair the owner's use of the property, the date of the injury or taking cannot be

determined without consideration of the essential factor of the regulation's duration.

We believe the trial court, in concluding that the taking "occurred" prior to May, 1986, ignored this unique characteristic of regulations. . . .

> [W]here, as here, the regulatory restrictions are applied repeatedly and continually, the private injury and thus the "taking" continues to "occur" until such time as the regulations are removed or just compensation is paid.

*The Mill,* 787 P.2d at 180. The court of appeals then held:

> [B]ecause the "taking" which triggered the Mill's condemnation claim continues and the State possesses the right to condemn, the Mill has sufficiently alleged the legal basis and facts, which, if proven, would establish all of the elements of inverse condemnation.

*The Mill,* 787 P.2d at 180. The court of appeals erred both in its reasoning and in its holding.

■ Contrary to the court of appeals' analysis, the duration, continuity, or uniqueness of regulations cannot transform a regulatory taking claim into an inverse condemnation action. Just as physical takings are not continuous, the continued application and duration of regulations do not make regulatory takings "continuous" for the purpose of maintaining an action in inverse condemnation.[5] In both regulatory and physical takings, the taking "occurs" at a certain point and the unconstitutional taking continues to "occur" until the taking ceases or just compensation is paid. The measure of damages for the taking is the value of the use of the land during the taking. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 319,

---

4. Because the court of appeals held that the taking continued to occur through May 1986, when the parties agreed CSDH had the power of eminent domain, the court of appeals did not address the issue of whether CSDH was granted the power of eminent domain by the 1979 statute. *The Mill,* 787 P.2d at 179, 180.

5. It is not contended that physical takings can be continuous. This position would be inconsistent with the holdings of *Monen v. State Dep't of Highways,* 33 Colo.App. 69, 71, 515 P.2d 1246, 1247 (1973) (the right to damages accrues at the time of the taking), and *Seven Lakes Reservoir Co. v. Majors,* 69 Colo. 590, 598, 196 P. 334, 336 (1921) (statute of limitations in inverse condemnation begins to run when the taking occurs).

107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987). Although it may be difficult to determine when a regulatory taking commences (especially when regulations are gradually and continually applied), regulatory takings like physical takings commence at a certain point. *See First English*, 482 U.S. at 321, 107 S.Ct. at 2389 (holding that compensation is required for temporary regulatory takings);[6] *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485–502, 107 S.Ct. 1232, 1241–1251, 94 L.Ed.2d 472 (1987) (articulating and applying a test for whether a regulatory taking has occurred). Thus, there is no justification for holding that a regulatory taking is continuous for the purpose of maintaining an action in inverse condemnation.

■ Moreover, we disagree with the determination implicit in the court of appeals' holding that a party may sue a state entity in inverse condemnation so long as the state entity acquires the power of eminent domain while the taking is still occurring. We hold that for a litigant to be able to sue a state entity in inverse condemnation, the state entity must possess the power of eminent domain at the time of the taking. This rule is consistent with the previously established rules that the state entity must possess the power to condemn for a litigant to proceed in inverse condemnation, *see, e.g., Collopy*, 625 P.2d at 1005, that the right to damages for a taking accrues to a landowner at the time of the taking, *Monen v. State Dep't of Highways*, 33 Colo. App. 69, 71, 515 P.2d 1246, 1247 (1973), and that the statute of limitations in inverse condemnation actions begins to run when the taking occurs. *Seven Lakes Reservoir Co. v. Majors*, 69 Colo. 590, 598, 196 P. 334, 336 (1921).

The trial court in this case found that the regulatory taking commenced in 1984, when O.C. Coal terminated its lease.[7] Given this finding and the fact that CSDH did not obtain the power to condemn until May 1986, The Mill's inverse condemnation claim must be dismissed.

## III.

■ We also granted certiorari to determine whether the court of appeals erred in merging all claims and defenses into the inverse condemnation claim. If we hold that all claims are subsumed in the inverse condemnation claim, all of The Mill's claims will be dismissed along with its inverse condemnation claim. Thus, the issue is whether inverse condemnation is the exclusive remedy for a regulatory taking. We hold that The Mill is not limited to the remedy of inverse condemnation.

The United States Supreme Court has not specified a preferred or exclusive remedy for a regulatory taking. *See San Diego Gas & Elec. Co. v. San Diego*, 450 U.S. 621, 660, 101 S.Ct. 1287, 1308, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting) ("[T]he [Takings Clause of the United States] Constitution does not embody any specific procedure or form of remedy that the States must adopt.... The only constitutional requirement is that the landowner must be able meaningfully to challenge a regulation that allegedly effects a 'taking,' and recover just compensation if it does so."). *See also First English*, 482 U.S. at 319, 107 S.Ct. at 2388 (damages for a temporary regulatory taking are the value of the use of the land during the taking). The Court has analyzed whether a regulatory taking occurred under the same test regardless of whether the claim specifically was based on inverse condemnation or the claim merely alleged a "taking." *Compare Agins v. Tiburon*, 447 U.S. 255, 258, 100 S.Ct. 2138, 2140, 65 L.Ed.2d 106 (1980) (landowner sought damages specifically in inverse condemnation) *with Keystone Bituminous Coal Ass'n*, 480 U.S. at 479, 107 S.Ct. at 1238 (landowners alleged "a taking of their

---

**6.** The Court held that compensation was required for temporary physical takings long before the Court held that compensation was required for temporary regulatory takings. *See First English*, 482 U.S. at 318, 107 S.Ct. at 2387.

**7.** The trial court specifically stated that the "use deprivation became important" when O.C. Coal terminated the lease. This analysis coincides with the Supreme Court's test for a regulatory taking as the denial of "economically viable use" of the property. *Keystone Bituminous Coal Ass'n*, 480 U.S. at 485, 107 S.Ct. at 1241.

property in violation of the Fifth and Fourteenth Amendments"). However, "it has been established ... that claims for just compensation are grounded in the Constitution itself.... [T]he Court has frequently repeated the view that, in the event of a taking, the compensation remedy is required by the Constitution." *First English*, 482 U.S. at 315–16, 107 S.Ct. at 2385–86. *See also United States v. Clarke*, 445 U.S. at 257, 100 S.Ct. at 2140 (noting that the Court has authorized inverse condemnation actions based on "the self-executing character of the [Takings Clause of the United States Constitution] with respect to compensation....").

■ Under Colorado law, inverse condemnation is not the exclusive remedy for a taking. *Collopy v. Wildlife Comm'n*, 625 P.2d at 1005–06; *Ossman v. Mountain States Tel. and Tel. Co.*, 184 Colo. 360, 364, 520 P.2d 738, 741 (1974); *Game and Fish Comm'n*, 162 Colo. at 310, 426 P.2d at 566. In *Ossman*, we held that a landowner may elect whether to proceed in inverse condemnation or trespass where a trespasser refuses promptly to initiate eminent domain proceedings. *Ossman*, 184 Colo. at 364, 520 P.2d at 741. Moreover, in *Game and Fish Comm'n*, we held that because a property owner seeking to recover for damage to property caused by a state agency that had no power to condemn could not be held to have commenced an inverse condemnation action, the property owner was not limited to the measure of damages usually applicable in a condemnation case. *Game and Fish Comm'n*, 162 Colo. at 310,

426 P.2d at 566. *See also Collopy*, 625 P.2d at 1005–06 (a litigant who alleges a taking without just compensation by an agency that does not have the power of eminent domain is not limited to the remedy of inverse condemnation).

We decline to restrict the remedy for a taking to inverse condemnation where the potential consequence of such a holding would be that a property owner would have no remedy for a violation of the self-executing Takings Clauses of the United States and Colorado Constitutions. Limiting a property owner to an inverse condemnation action against an agency that does not have the power of eminent domain would enable the State to take property without paying compensation, in violation of the United States and Colorado Constitutions.[8]

In addition, we note that there is a difference between a regulatory taking and a taking by eminent domain. Regulatory takings are difficult to define, *The Mill*, 787 P.2d at 180, and calculation of damages often may be difficult. Thus, even though claims for regulatory takings are grounded in the Takings Clauses of the United States and Colorado Constitutions, they need not be treated as eminent domain proceedings under section 38–1–101 to –122, 16A C.R.S. (1982 & 1990 Supp.). *Cf. Ossman*, 184 Colo. at 366, 520 P.2d at 742; *Game and Fish Comm'n*, 162 Colo. at 309, 426 P.2d at 566; *Stuart v. Colorado E. R.R. Co.*, 61 Colo. 58, 70, 156 P. 152, 156 (1916).

For these reasons, we conclude that The Mill's claims for regulatory taking and

8. This, apparently, was the concern that prompted the court of appeals to hold that the alleged taking in this case was continuous. The court of appeals warned that "the singular purpose of the [Takings Clauses] would be severely diminished were we to conclude, as did the trial court, that the taking alleged by The Mill was limited to a specific date which occurred prior to the May 16, 1986 amendment which expressly authorized the State's power of eminent domain." *The Mill*, 787 P.2d at 180.

We agree with the court of appeals that a property owner cannot be denied a remedy for an unconstitutional taking by an agency that did not have the power of eminent domain. *See, e.g., Collopy*, 625 P.2d at 1005 ("To compel [a litigant] to proceed in inverse condemnation [against an agency that lacks the power of eminent domain] ... would enable [the agency] to acquire indirectly property rights the legislature has denied it the power to acquire by direct condemnation."); *Fountain v. Metropolitan Atlanta Rapid Transit Auth.*, 678 F.2d at 1044 ("If a private party were unable to seek redress under the just compensation clause when an official agency acts outside its statutory powers and takes property for public use, the state would be able to escape liability under the just compensation clause by taking property through agencies without statutory powers of eminent domain.").

promissory estoppel, along with the State's defenses to those claims, are not subsumed in the inverse condemnation action. We therefore remand this case to the court of appeals for resolution of The Mill's remaining claims and the State's defenses to those claims.[9]

Judgment reversed and case remanded to the court of appeals for further proceedings consistent with this opinion.

---

9. As discussed above, *supra,* pp. 436–437, since this case was tried, CSDH initiated a condemnation action on The Mill's property. The trial court in this case, however, awarded damages on the assumption that CSDH would clean The Mill's property and return it to The Mill in a cleaned and unrestricted state. Thus, if the court of appeals determines that a regulatory taking has taken place, it also must be determined whether the award of damages to The Mill for the temporary regulatory taking must be revised in light of the condemnation proceeding.