* Prior opinion announced December 31, 1992 was Withdrawn. Petition for Rehearing of The Mill

granted and to amend the decree accordingly.

PLANK and MARQUEZ, JJ., concur.

THE MILL, Plaintiff–Appellant,

v.

STATE of Colorado, DEPARTMENT OF HEALTH, Defendant–Appellee.

THE MILL, Plaintiff–Appellee and Cross–Appellant,

v.

STATE of Colorado, DEPARTMENT OF HEALTH, Defendant–Appellant and Cross–Appellee.

DEPARTMENT OF HEALTH, State of Colorado, Petitioner–Appellee,

v.

THE MILL, Respondent–Appellant.

Nos. 87CA0502, 87CA0838 and 91CA0770.

Colorado Court of Appeals, Division II.

April 22, 1993.*

Rehearing Denied June 10, 1993.

Certiorari Granted March 7, 1994.

Granted. Petition for Rehearing of The State of Colorado Denied.

Holley, Albertson & Polk, P.C., George Alan Holley, Eric E. Torgersen, Golden, for plaintiff-appellant, plaintiff-appellee and cross-appellant, and respondent-appellant.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Jerry W. Goad, First Asst. Atty. Gen., Denver, for defendant-appellee, defendant-appellant and cross-appellee, and petitioner-appellee.

Opinion by Judge SMITH[**].

In an initial consolidated appeal (87CA0502, 87CA0838), The Mill, a partnership, appealed the trial court's dismissal of its claim in inverse condemnation against the Department of Health (State), and both parties appealed the trial court's award to The Mill of $200,000 in damages for what the court determined to be a temporary regulatory taking. In that appeal, we reinstated The Mill's inverse condemnation claim against the State. *The Mill v. State,* 787 P.2d 176 (Colo. App.1989). However, on certiorari review, the Supreme Court reversed that ruling, and the matter is now before us on remand. *State of Colorado v. The Mill,* 809 P.2d 434 (Colo.1991).

In addition to the matters on remand, we have consolidated The Mill's appeal of the State's condemnation of The Mill property (91CA0770) under its newly acquired authority to take, by eminent domain, properties which have been designated under the Uranium Mill Tailings Radiation Control Act, 42 U.S.C. §§ 7901 to 7942 (1988) (UMTRCA) as eligible for remedial action. *See* § 25–11–303(1)(d)(III), C.R.S. (1989 Repl.Vol. 11A).

As to this latter appeal (91CA0770), we reverse the trial court's judgment and remand the cause for further proceedings.

In light of our disposition of the appeal in the eminent domain proceeding, the damage claim issues based upon "promissory estoppel" and "regulatory taking" theories are largely subsumed in that decision. We arrive at that conclusion because, even if there were a regulatory taking or if a promissory estoppel had arisen, the specific monetary damages arising therefrom could not exceed the fair market value of the property. Thus, since the State will be required to pay the total fair market value of the property in the eminent domain proceeding, the issues in the other two cases are rendered moot, except as to the question concerning whether a regulatory taking occurred and, if so, when it occurred and the effect of such a taking upon the condemnation award. We affirm the trial court's findings and conclusion that a total regulatory taking occurred upon cancellation of the coal company lease in May of 1984.

The property at issue here consists of a 61–acre parcel that was, essentially, divided into two parts: The mill yard (roughly 25 acres) and the tailings pile (approximately 36 acres). The property was operated as a uranium and uranium mill tailings disposal site in the late 1950s and until 1962. This activity left the property and the buildings and equipment located on the property contaminated with radioactive material.

Milling operations were originally conducted pursuant to a license issued by the Atomic Energy Commission (AEC) which, after milling operations ceased, was reissued to permit only the storage on the property of past mill tailing products and contaminated equipment and buildings. The permit was again amended in 1968 to allow the transfer of decontaminated equipment. Also in 1968, the State was delegated authority by the AEC to regulate radioactive materials formerly under the jurisdiction of the AEC. In 1971, the State delicensed the mill yard and the property was authorized for unrestricted use.

In 1973, after reviewing all available governmental records regarding the property and discovering the foregoing information relative to the status of the property, The Mill purchased the entire 61 acres.

In 1978, as a result of the growing awareness of the potential public health hazards presented by uranium mill tailings, Congress passed UMTRCA for the purpose of cleaning up "designated" uranium processing sites.

[**] Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, Sec. 5(3), and § 24–51–1105, C.R.S. (1988 Repl.Vol. 10B).

Under UMTRCA, processing sites would be either acquired by the State or decontaminated at the government's expense and returned to the property owner.

All 61 acres of The Mill's property were subsequently designated as a "processing site" under UMTRCA, and, in 1981, The Mill and the Department of Energy (DOE) entered into a limited agreement permitting DOE to test the 35–acre tailings pile. Nonetheless, testing was ultimately performed on all 61 acres and contamination of the 'delicensed' or unregulated mill yard was confirmed by the DOE in 1982.

In 1983, The Mill leased its property to O.C. Coal Company, primarily for the storage of coal, at a rental of $7,000 per month. Subsequent to being notified of this lease, the State began issuing The Mill a series of letters and communications which restricted the property's use for coal storage, and, in May of 1984, the coal company prematurely terminated its lease. Since then, The Mill has earned only approximately $500 to $700 a month from the mill yard based upon 20% building use.

Alleging that, because of the State's restrictions, the property could not be put to any reasonable economic use, The Mill filed a complaint in January 1986, alleging three claims for relief: Inverse condemnation; a regulatory taking; and that the State was estopped to deny it the use of its property. The trial court subsequently dismissed The Mill's claim in inverse condemnation.

Upon trial of the remaining claims, the court ruled that the State had so diminished The Mill's right to use its property that it had effected a regulatory taking. Measuring damages in terms of "loss of use" over the period of time which the trial court anticipated decontamination of the property under UMTRCA would require, the court awarded The Mill $200,000.

While these issues were on appeal, the State initiated an action to condemn The Mill property in fee simple under § 25–11–303(1)(d), C.R.S. (1989 Repl.Vol. 11A). In response, The Mill moved for and was denied a dismissal or stay of the action pending the outcome of the consolidated appeal. Pursuant to a stipulation of the parties, the court determined that the fair market value of the property was zero, and it accordingly entered a "rule and order," or judgment, vesting title to The Mill property in the State.

## I. 91CA0770

### The eminent domain appeal

In its appeal of the eminent domain proceedings, The Mill contends that the trial court's judgment vesting the State with fee simple title to The Mill property must be vacated. We agree.

The record reveals that the "zero" award in the condemnation action here was the result of a stipulation entered into by the parties in lieu of an evidentiary hearing under § 38–1–106, C.R.S. (1982 Repl.Vol. 16A). That stipulation entered into by The Mill and the State provided in relevant part:

> Decontaminating The Mill's property, which is presently contaminated with radioactive material, is a public purpose as set forth by statute in the Uranium Mill Tailings Radiation Control Act, 42 U.S.C. § 7901 et seq. and the Colorado Radiation Control Act, § 25–11–301 et seq. C.R.S.
>
> In its present condition, the cost of remedial action and cleanup of The Mill's property to properly decontaminate it exceeds the fair market value which the property would otherwise have if completely uncontaminated. Therefore, in its present condition, the value of The Mill's property is zero.
>
> . . . .
>
> The Colorado Department of Health has the necessity for immediate possession of The Mill's property in order to commence the remedial action and decontamination operations which are the purpose of the present condemnation proceeding. (emphasis added)

A stipulation, like any other agreement between private parties, may be set aside if "there is a sound reason in law or equity" to do so. *See generally Lake Meredith Reservoir Co. v. Amity Mutual Irrigation Co.,* 698 P.2d 1340 (Colo.1985).

The stipulation is, by implication, a direct result of our decision in *Department of Health v. Hecla Mining Co.,* 781 P.2d 122 (Colo.App.1989), in which, as here, the State sought to condemn property, like that at issue in this appeal, heavily contaminated with radioactive uranium tailings and designated under UMTRCA as one of the specific sites eligible for remedial action. We held that the *Hecla* condemnation, likewise triggered by UMTRCA, was indisputably for a "public purpose."

Of critical importance, in *Hecla,* we also held that, as in other eminent domain proceedings, valuation of the condemned property was governed by the principle that an owner of land which is condemned is not entitled to recover the increase or enhancement in the value of his land which is caused by the very improvement for which the land is being acquired. *Williams v. City & County of Denver,* 147 Colo. 195, 363 P.2d 171 (1961). Determining that evidence of the value of Hecla's property in its uncontaminated condition would represent such an increase or enhancement in value, we ruled that, in ascertaining the fair market value of Hecla's property for the purpose of awarding just compensation, no evidence of the uncontaminated value of the condemned land was admissible even though, as here, in its contaminated condition, the value of the property was zero.

In short, *Hecla* was entirely dispositive of all the issues to be resolved by the court in The Mill's immediate possession hearing under § 38-1-106, C.R.S. (1982 Repl.Vol. 16A). Likewise, it was dispositive of the only other issue pending, that of determining the fair market value of the property being condemned.

Evaluating the parties' stipulation here, thus, necessarily compels us to re-evaluate our conclusion in *Hecla* that, in valuing UMTRCA properties for the purpose of awarding just compensation, evidence of the uncontaminated value of the property was improper. Our analysis begins with an examination of the origin of both federal and State action, UMTRCA, and with an assessment of whether our holding in *Hecla* is consistent with this statutory scheme. We

conclude that it is not and that, accordingly, the stipulation must be set aside.

The purpose of UMTRCA is clearly stated in the Act, that is, to stabilize and control residual uranium radioactive materials at certain specially identified, privately held, inactive mill sites that were previously producers of uranium for the federal government. 42 U.S.C. §§ 7901, 7911 (1988).

■ Provisions of UMTRCA reflect, if not a federal responsibility for the contamination of these mill sites, a federal *obligation* to stabilize and control the undisputed hazards of radioactivity. 42 U.S.C. § 7901 (1988). Accordingly, the statutory scheme vests considerable authority in the Secretary of the Department of Energy (Secretary) to complete remedial action at the designated sites promptly.

Implementation is to proceed under federal/state cooperative agreements which delegate to the states the "means" to access these privately held lands and to fund the remedial action required to achieve decontamination. 42 U.S.C. § 7913 (1988).

Specifically, UMTRCA provides that access will be obtained either through written consent of the property owner or, at the Secretary's determination, through "acquisition" of the site by the state. Funding will be 90% federal dollars and 10% state dollars. 42 U.S.C. § 7917 (1988). Significantly, *private owners* of sites that are not acquired through purchase or condemnation, are required to pay nothing for the consensual remedial cleanup of their property. *Hecla Mining Co. v. United States,* 909 F.2d 1371 (10th Cir.1990).

■ In short, the foregoing statutory scheme obligates the federal government, and to a lesser extent the state government, to undertake and to pay the costs of the remedial action compelled by the presence of unstable and uncontrolled uranium mill tailings.

However, application of the *Hecla* rule effectively predetermines the fair market value of any properties in which access for clean-up is obtained by a condemnation proceeding initiated under UMTRCA at zero or minimal

value. This is true irrespective of the fact that the property owner may have a substantial investment in the property. Accordingly, the owner's investment becomes a casualty of, and hence, part of the "cost" of, remedial action.

Thus, we conclude that the *Hecla* rule, which precludes the admission of evidence of the value of UMTRCA properties in their uncontaminated state for the purpose of determining just compensation, is inconsistent with this statutory scheme because it results in imposing at least a portion of the cost of clean-up on the *property owner* rather than the federal and state governments.

In support of the result we reach here, it should be noted that UMTRCA provides that, before offering for public sale any processing sites which the state has acquired, the state shall offer to sell such lands at their fair market value as *decontaminated* back to the person from whom they were acquired. 42 U.S.C. § 7914 (1988). Thus, if, as in the case of *Hecla, supra,* decontamination increases the value of the property from zero to $3.5 million, the original property owner, who received nothing or almost nothing for his property in the condemnation proceeding and who elects to reacquire the property under the statute, in effect, subsidizes the 'cost' of the remedial action.

The unfair and disparate treatment of the owners of designated sites is the inevitable result of applying traditional condemnation rules to UMTRCA condemnations. A similar result does not occur when access for remedial action is accomplished through UMTRCA's alternative means, that is, by obtaining the property owner's written consent. Indeed, the disparate treatment created between similarly situated property owners by application of the *Hecla* rule is further evidence that the traditional enhancement rule was not intended to apply under UMTRCA.

Thus, UMTRCA—the basis and authority for all federal and state action for remedial clean-up action on designated inactive uranium contaminated mill sites—does not support the rule announced in *Hecla, supra,* for valuation of UMTRCA properties subject to acquisition through condemnation. Condemnation in such instances is but one "means"

to the "end"—remedial action undertaken solely at the federal government's initiative and predominately at its expense. Hence, condemnation, for the purpose of clean-up pursuant to UMTRCA, albeit proceeding under state law, must be consistent with this "end." Application of the *Hecla* rule would negate this consistency.

UMTRCA's legislative history further bolsters our conclusion. Nowhere in the extensive Congressional Committee reports discussing the federal law is the concept expressed, or even implied, that the property owner should be burdened by the cost, or any portion thereof, of the remedial action contemplated by the Act. Quite to the contrary, the focus of the Act is on the potential and significant radiation health hazard to the public that the tailings present and the federal government's lack of authority, absent this legislation, to stabilize and control this hazard.

The Act provides for an appropriation of funds and their expenditure under a shared cost formula which neither precludes state participation nor excessively burdens the federal budget. Indeed, in at least one committee report, it is specifically acknowledged that benefits to the property owner will accrue from the government's *voluntary remedial action* as provided by the Act. H.R.Rep. No. 95–1480, 95th Cong., 2d Session Pt. 2, at 7464 (1978) *reprinted in* U.S.Code Cong. & Admin.News 7450.

■ Therefore, in summary, based on UMTRCA's express statutory scheme for remedial action, interpreted in light of the Act's legislative history, we conclude that in valuing properties designated under 42 U.S.C. § 7912, for the purpose of determining just compensation in a condemnation proceeding for remedial decontamination operations under UMTRCA, the Congress intended that the rule against enhanced valuation set forth in *Williams, supra,* should not apply. To the extent that *Hecla, supra,* holds to the contrary, we feel compelled not to follow it.

The State advances several objections to our holding above. We conclude that none are persuasive.

First, the State argues that our analysis ignores specific reference to the applicability of the rule against enhanced value (§ 24–56–117(1)(c), C.R.S. (1988 Repl.Vol. 10B)) in the Radiation Control Act, § 25–11–301, et seq., C.R.S. (1989 Repl.Vol. 11A).

■ Inasmuch as 24–56–117(1)(c) is a codification of the rule against enhanced value, our preceding discussion mandates our conclusion that it is inapplicable here because it directly conflicts with, and defeats the purpose of, UMTRCA. To apply it in order to exclude evidence of the value these properties would have if the decontamination had been accomplished would reject the basic scheme of both UMTRCA and the State Radiation Control Act. We view this as the only conclusion consistent with § 25–11–303, C.R.S. (1988 Repl.Vol. 10B) which, in addition to authorizing state participation in UMTRCA, specifically provides that:

> [D]ecision[s] made pursuant to the provisions of article 1 of title 38, C.R.S., shall be made in accordance with the criteria established in § 24–56–117(1)(c), C.R.S. *and the provisions of the federal Uranium Mill Tailings Radiation Control Act of 1978.* (emphasis added)

Moreover, this conclusion is consistent with the distinction between acquisition for a public *improvement* and acquisition, as here, for a public *purpose* in the interest of the public health safety and welfare.

The former involves an anticipation that the property acquired will be put to a continuing public use, one which is reasonably likely to enhance the value of the acquired or adjacent property. This related benefit resulting from public acquisition and use is absent when the acquisition of property is to eliminate a public health or safety hazard, like that underlying UMTRCA, because the property, at least at the time of condemnation, has no anticipated continuing public use. Indeed, UMTRCA specifically seeks in several ways to maintain private ownership of the properties designated for remedial action or to restore it to private use after decontamination. *See* 42 U.S.C. §§ 7913, 7914 (1988).

■ Accordingly, we conclude that § 24–56–117(1)(c), as it appears in the Radiation Control Act, must be interpreted as a general policy of state land acquisition which is modified, in this instance, by the specific policies for state land acquisition under UMTRCA.

Next, the state argues that allowing evidence of UMTRCA properties' uncontaminated value creates a special rule for one hazardous material but not for others. While this may be true, a review of the Act's legislative history indicates that this was precisely the Congress' intent.

Particularly revealing in this regard is the report of the House Congressional Committee on Interstate and Foreign Commerce which states in pertinent part:

> [T]he committee ... stresses that it does not consider [UMTRCA] a precedent to be followed in the case of other waste management problems ... [T]he situation at these inactive sites is quite unique in that there was once Federal licensing of the operations, but, due to a loophole in the law, the sites escaped control after operations ceased. Moreover, in each case, most, if not all, of the production was for Federal purposes.

H.R.Rep. No. 95–1480, 95th Cong., 2d Sess. Pt. 2, at 7457 (1978), *reprinted in* U.S.Code Cong. & Admin.News 7450.

■ In light of the foregoing discussion, we hold that the fair market value of properties, for the purpose of determining just compensation in a condemnation proceeding deemed necessary to commence remedial action and decontamination operations under UMTRCA, may properly include evidence of the value of the property if it were uncontaminated.

■ We also hold, because this determination is entirely contrary to *Hecla, supra,* that to enforce a stipulation, such as that entered into by The Mill and the State here, and which arose because of our decision in *Hecla,* would be manifestly unfair and unjust. Accordingly, we further hold that a sound reason in law exists to void the stipulation, and thus, we conclude that the trial court's judgment vesting title to The Mill property in the State based upon a "zero" valuation cannot stand.

## II. 87CA0502 and 87CA0838

### A. The damage award.

■ Both parties contest the trial court's $200,000 award to The Mill for what the court determined to be a temporary regulatory taking. We agree that this award, in light of subsequent events, was improper.

The State's temporary regulatory taking, if any, has evolved, by the State's election to proceed under its after-acquired power of eminent domain, into a *permanent* taking which conclusively resolves the issue of the State's liability. Likewise, the condemnation action, with the exception of determining the date of possession, will also resolve the issue as to the appropriate measure of just compensation to be awarded. And, because the value determined in the condemnation action is based on a permanent taking and the property's fair market value in fee, it will necessarily equal or exceed any amount of damages that could be awarded as a result of any temporary regulatory taking. *See First Lutheran Church v. Los Angeles County,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Falik & Shimko, *The Takings Nexus: The Supreme Court Forges a New Direction in Land–Use Jurisprudence,* 23 Real Property, Probate & Trust J. 1 (Spring 1988).

The damage judgment in 87CA0838 is therefore reversed.

### B.

We also must address the correctness of the trial court's determination that a regulatory taking occurred in 1984, only for the limited purpose of ascertaining when possession of The Mill's property became vested in the State.

■ The date of possession is crucial to a determination of "just compensation" by the eminent domain court for two reasons. First, the fair market value of land taken in condemnation is generally determined as of the date the condemnor obtains possession, if that date precedes the date of the hearing to assess compensation. Section 38–1–114, C.R.S. (1982 Repl.Vol. 16A); *City of Glendale v. Rose,* 679 P.2d 1096 (Colo.App.1983). Second, owners of condemned land are enti-

tled to interest on the amount awarded as the value of the land from the date the condemning authority obtains the possessory interest in such land. *Evergreen Fire Protection District v. Huckeby,* 626 P.2d 744 (Colo.App.1981).

It is true that the date of possession, which triggers the right to compensation, is normally the date on which, as the statute says, "the petitioner is authorized by agreement, stipulation, or court order to take possession. . . ." Section 38–1–114. Nevertheless, the strict interpretation that possession can only occur based on contract or court order cannot, in our view, be applied when an actual change of possession has in fact occurred. To so hold would put form ahead of substance and would be fundamentally unfair.

The constitutional requirement of just compensation is derived as much from basic equitable principles of fairness as from technical concepts of property law. *Board of County Commissioners v. Delaney,* 41 Colo. App. 548, 592 P.2d 1338 (1978); *see Comparet v. U.S.,* 164 F.2d 452 (10th Cir.1947). Thus, under the circumstances here, if a regulatory taking which deprived The Mill of virtually any economic use of the property did in fact occur in May of 1984, the fair market value must be determined as of that time, and, inasmuch as no deposit has been made, interest must be awarded on the value determined from that date forward.

### C. The Regulatory Taking

#### 1.

■ Preliminarily, the State has argued that there can be no regulatory taking here because the letters and communications between the State and The Mill were advisory, not regulatory, in nature. The trial court implicitly rejected this argument, however, concluding that the letters and communications constituted a "pattern of restriction," in effect, limiting use which it concluded was tantamount to *regulation.* We agree with the trial court.

A review of the letters from the State to The Mill discloses that a significant number of them referred to the State's regulatory

and licensing authority and The Mill's responsibilities thereunder. Moreover, at least one of the communications refers to The Mill's "non-compliance" with applicable regulatory and licensure requirements and directs The Mill to "take corrective steps ... to avoid further non-compliance."

Clearly, the thrust and effect of these communications is both mandatory and prohibitive. Hence, we perceive no error in the trial court's determination that these communications could form the basis of a regulatory takings claim.

### 2.

Next, the State contends that the trial court's analysis of the "takings" issue was in error. We disagree.

#### a.

First, the State challenges the legal analysis undertaken by the trial court in evaluating The Mill's "takings" claim.

The State argues that, in its analysis, the trial court improperly considered and weighed the private economic interests implicated by the State's action. Such factors, the State argues, are not relevant when, as here, the State's actions are prompted by a compelling public interest, such as a substantial health hazard.

 There is no set formula or clear rule which can generally be applied in analyzing a regulatory takings claim. *Kirk v. Denver Publishing Co.,* 818 P.2d 262 (Colo.1991); *Board of County Commissioners v. Flickinger,* 687 P.2d 975 (Colo.1984). Indeed, as our Supreme Court succinctly stated in *State Department of Highways v. Interstate–Denver West,* 791 P.2d 1119 (Colo.1990):

> To distinguish between permitted regulation, when no compensation is required, and a taking which requires compensation [raises] conceptual, theoretical, and practical issues ... which are difficult to resolve.

The distinguishing feature is often stated to be one of degree, that is, a determination that government regulation has gone "too far." *Pennsylvania Coal v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). This ultimate conclusion, in turn, is contingent on not one but several factors of "particular significance." *Pennsylvania Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

 One factor is the "character" of the government's action. *Pennsylvania Central Transportation Co. v. New York City, supra.* Government action which can be viewed as a physical invasion may more readily be found to constitute a taking than when the action arises from "some public program adjusting the benefits and burdens of economic life to promote the common good." *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

 Another factor is, indeed, the nature or purpose of the government's actions. *See Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). In particular, government regulation which prohibits an illegal misuse of private property (*Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887), or a use which is a nuisance or tantamount to a nuisance (*Goldblatt v. Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *Keystone, supra* ), does not require compensation, despite the fact that the regulations deprive the owner of a profitable or beneficial use of his property.

 Yet another significant factor, however, is the economic impact of the government's actions on the use of the property regulated, including the interference of the government's action with investment-backed expectations. *Keystone, supra; Pennsylvania Central Transportation Co., supra.* If the government regulation has an "unduly harsh impact" on the owner's use of the property, *Pennsylvania Central Transportation Co., supra,* or destroys essential and legal uses, *Curtin v. Benson,* 222 U.S. 78, 32 S.Ct. 31, 56 L.Ed. 102 (1911), then the regulation is *constitutionally* onerous by "forcing some people alone to bear public burdens which, in all fairness and justice should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4

L.Ed.2d 1554 (1960). *See also Agins v. Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); Short, *The Impacts and Issues Surrounding the Regulatory Confiscation of Real Property,* 3 B.Y.U.J.Pub.L. 261 (1988).

The foregoing extensive precedent was available to the trial court at the time it made its decision in the instant case. Subsequent to that date the United States Supreme Court decided *Yee v. City of Escondido,* —— U.S. ——, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992), reaffirming these principles, and *Lucas v. So. Carolina Coastal Council,* —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). The latter case, in light of the prior precedent is dispositive of the specific issues here. In *Lucas,* the court stated that: "[W]hen the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, he has suffered a taking." —— U.S. at ——, 112 S.Ct. at 2895, 120 L.Ed.2d at 815.

While the court in *Lucas* reiterated its requirement that a "taking" analysis was required, it announced a categorical rule to the effect that when the effect of government regulation, albeit in the public interest, is to extinguish all, or virtually all of the economic attributes of ownership, there is no theoretical justification upon which to deny compensation under the "takings" clause. *See generally* Berger, *The Year of the Taking Issue,* 1 B.Y.U.J.Pub.L. 261 (1987).

This clause *presupposes* that property is wanted for the public purpose but provides that it shall not be taken for such use under the Constitution *without the payment of just compensation. See Pennsylvania Coal v. Mahon, supra.*

▮ Furthermore, we hold that the scope of the trial court's analysis of the "takings" issue here was proper, particularly in light of the fact that *Lucas* had not yet been decided. Indeed, it closely and carefully tracked the multi-factored, pre *Lucas,* legal standard set forth above. Acknowledging the difficulties in evaluating a "takings" claim based on a series of restrictive acts, the trial court's analysis focused on three areas: The public interests triggering the State's actions; the private interests it affected; and, finally,

upon whom the "costs" occasioned by these competing interests should fall.

Moreover, the trial court acknowledged that the State's actions coincided with an "evolution of knowledge" regarding the hazards of radiation which began after the mill yard was delicensed. The court also noted that the current state of knowledge *now* indicated that there is "no known safe level of radiation" and that, hence, the thoroughly contaminated mill property, in its present condition, was indeed unsafe for general public access.

Next, the trial court explored the economic effects of the State's interference. In doing so, the court noted that The Mill had purchased the property as a speculative venture, expecting that the property would appreciate. The trial court then noted that since 1973, the use and planned use of the mill yard had been primarily storage. However, even this use had become, through the directives issued by the State, limited to buildings in the yard covered with concrete and a 50–foot strip alongside. Moreover, the trial court found this limitation on use was a direct cause for termination of the coal company's lease, a loss of $7000 per month.

Finally, the trial court engaged in an express public-private interest analysis to determine who should bear the "costs" associated with the State's action in the public interest and The Mill's ensuing loss of use. Here, the trial court specifically found that the public interest outweighed the private interests of The Mill and recognized The Mill's lack of participation in any nuisance-like use of the property.

Briefly, the findings and conclusions of the trial court reveal that it recognized the need for a State response to the radiation despite its lack of knowledge regarding the hazard posed by radiation contamination at the time The Mill purchased the property. The trial court concluded that the total economic deprivation caused by the State's restriction on The Mill's use of the property should not fall on the owner. Accordingly, the trial court ruled that the State's series of regulatory letters and communications had, indeed, ef-

fected a total regulatory "taking" in May of 1984.

In sum, we hold that the trial court did not err in its legal analysis of the "takings" issue. Specifically, upon recognizing the compelling public health hazard presented by The Mill's radiation contamination, the trial court properly proceeded in its analysis to consider and weigh the private economic interests implicated by the State's response to this hazard.

#### b.

Next, the State argues that the trial court's factual assessments relating to the foregoing "significant factors" were not supported by the evidence. Specifically, the State argues that the trial court erred in finding that, based on the radiation hazard and the resulting restriction on its use imposed by the State, the mill yard could be put to no economic use and had no value.

When sitting as a finder of fact, the trial court is the sole determiner of the sufficiency, credibility, weight of the evidence, and the inferences and conclusions to be drawn therefrom. *Cottonwood Hill, Inc. v. Ansay*, 709 P.2d 62 (Colo.App.1985). Hence, only in instances in which the trial court's determination of these issues finds no support in the record will an appellate court substitute its judgment for that of the trial court. *Page v. Clark*, 197 Colo. 306, 592 P.2d 792 (Colo.1979).

Such is clearly not the case here. The trial court's finding of no viable economic use and consequent loss of value was confirmed by the testimony of a number of expert witnesses. Two experts testified that the entire 61 acres was contaminated to a level that would require not only the demolition of existing buildings but also the removal of the top soil. Moreover, while some testimony did indicate that some portion of the property could still be used for storage, even this use was questionable in light of other testimony establishing unacceptable levels of radiation within these structures. Finally, the State's own communication to The Mill in 1984 further established that virtually none of The Mill's property was free enough from surface contamination to be useable for stor-

age without compromising the acceptability of the stored goods.

In short, the trial court's finding of no remaining viable economic use and consequent determination of "no value" was supported by the record. We are bound by these findings.

In conclusion, we perceive no error in either the trial court's analysis or conclusion that the state's restrictive actions, under the particular circumstances of this case, amounted to a total regulatory taking.

The trial court's judgment in 91CA0770 vesting title to The Mill property in the State is reversed, and the cause is remanded for a new determination of just compensation in the condemnation proceeding consistent with the views expressed in this opinion. The trial court's determination in the consolidated appeal of cases 87CA0502 and 87CA0838 that a regulatory taking occurred and the effective date of that taking are affirmed. The issues remaining in those appeals are rendered moot by the State's subsequent proceeding in eminent domain.

PLANK and HUME, JJ., concur.