STATE of Colorado, DEPARTMENT OF HEALTH, Petitioner,

v.

THE MILL, a limited partnership, Respondent.

No. 93SC418.

Supreme Court of Colorado, En Banc.

Dec. 19, 1994.

Rehearing Denied Jan. 17, 1995.

ing in the court of appeals, it was consolidated with an appeal by The Mill in an eminent domain action brought by CDH pursuant to the federal Uranium Mill Tailings Radiation Control Act (UMTRCA), 42 U.S.C. sections 7901 to 7942 (1988), and the corresponding state statute, sections 25–11–301 to –305, 11A C.R.S. (1989).

In the regulatory taking action, the court of appeals upheld the trial court. It ruled that use limitations recommended by CDH in correspondence with the Mill during 1983 constituted a total regulatory taking and remanded for a new determination of just compensation. *The Mill v. State of Colorado, Department of Health,* 868 P.2d 1099 (Colo. App.1993). In the eminent domain action, the court reversed the trial court and held that Colorado's rule against enhanced value [1] did not apply in condemnation actions under UMTRCA and that evidence of the decontaminated value of the Mill's property must be admitted in order to determine its fair market value. *Id.* For the reasons discussed below, we reverse the court of appeals' rulings on both issues and remand with directions.

I.

The property at issue in this case is a 61–acre parcel on which uranium milling operations were once conducted pursuant to an Atomic Energy Commission (AEC) license. Thirty-six acres of the property were covered by uranium mill tailings. The remaining twenty-five acres were used as the mill yard. After milling operations ceased, the property was used as an uranium mill tailings disposal site, also pursuant to an AEC license. In 1968, the AEC delegated authority to the State of Colorado to regulate radioactive materials and jurisdiction over the AEC license was transferred to the state. Then, in 1971, the state terminated the license. The tailings pile remained subject to state uranium mill tailings regulations. In 1973, after reviewing the available state records,[2] The Mill

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Jerry W. Goad, First Asst. Atty. Gen., Natural Resources Section, Denver, for petitioner.

Holley, Albertson & Polk, P.C., George Alan Holley, Eric E. Torgersen, Denver, for respondent.

Justice MULLARKEY delivered the Opinion of the Court.

This case is a consolidation of two cases. The first was a regulatory taking action initially brought by respondent, The Mill, against petitioner, the Colorado Department of Health (CDH). While that case was pending

---

1. *See Williams v. City & County of Denver,* 147 Colo. 195, 198–202, 363 P.2d 171, 173–75 (1961); § 24–56–117(1)(c), 10B C.R.S. (1988).

2. The stipulated facts submitted to the trial court stated that, due to termination of the license, the mill yard was authorized for unrestricted use. Trial testimony and documents taken from CDH files indicate only that the mill structure was

purchased the entire 61–acre parcel. From 1973 to 1983 the site was used for storage. During this time, CDH actively monitored The Mill's maintenance of the tailings pile and the condition of the mill yard.

In 1978, Congress passed the Uranium Mill Tailings Radiation Control Act. UMTR-CA mandated the designation and clean up of uranium processing sites. Pursuant to UMTRCA, the entire 61–acre parcel belonging to The Mill was designated as a uranium processing site. In 1980, testing on the entire parcel indicated that contamination existed in both the tailings pile and the mill yard sufficient to qualify the site for clean up under UMTRCA.

In 1983, The Mill leased the mill yard to O.C. Coal Company for $7,000 per month for coal storage. The Mill notified CDH of the lease and CDH met on March 11, 1983, with both parties to discuss certain precautions to avoid the spread of radioactive contamination from the property. The agreed-upon precautions were confirmed in letters sent by CDH to The Mill and O.C. Coal Company on March 15, 1983. These precautions limited the area available for storage to those portions of the property where contaminated soils would not mix with the coal. On July 15, 1983, CDH sent The Mill a summary of a routine inspection which indicated non-compliance with CDH tailings regulations including failure to post warning signs on the property, no gates to secure the tailings pile, and signs of horses grazing on the piles. In addition, CDH notified The Mill that coal had been stored contrary to the terms of the agreement documented in the March 15 letter. These letters are the basis for the alleged regulatory taking.

O.C. Coal prematurely terminated its lease in May 1984. After that time, under the use restrictions urged by CDH, the income from the mill yard fell to between $500 and $700 per month. The Mill argues that this was not a reasonable economic return on the property.

In 1986, The Mill filed an action against CDH claiming that, because of the restrictions placed on the use of the mill yard, the property could not be put to any reasonable economic use. The Mill pled as grounds for relief inverse condemnation, regulatory taking, and estoppel. The trial court dismissed the inverse condemnation claim but found that the state had effected a regulatory taking and awarded $200,000 to The Mill in lost-use value during the period necessary for decontamination. On appeal, the court of appeals reversed the dismissal of the inverse condemnation claim and held that all other claims were subsumed in the inverse condemnation claim. *The Mill v. Department of Health,* 787 P.2d 176 (Colo.App.1989) (*The Mill I*). This court reversed the court of appeals' decision and remanded the case for consideration of The Mill's regulatory taking and estoppel claims. *Department of Health v. The Mill,* 809 P.2d 434 (Colo.1991) (*The Mill II*).

While those issues were on appeal, CDH filed an action to condemn The Mill's property under section 25–11–303(1)(d), 11A C.R.S. (1989). In this action, the parties stipulated that the market value of the property in its contaminated state was zero, and the trial court entered a judgment vesting title to the property in the state. The Mill appealed the judgment. The condemnation action and the regulatory taking action were consolidated for consideration by the court of appeals.

In the consolidated action, the court of appeals found that both The Mill's regulatory taking and estoppel claims were "subsumed" in its disposition of the eminent domain proceeding because the monetary award arising from any of the claims could not exceed the fair market value of the property. The court found that the regulatory taking issue was relevant to the eminent domain action only as it determined at what point the property was taken. The court (1) affirmed the trial court's ruling that there had been a regulatory taking; (2) *sua sponte* set aside the stipulation of zero value on grounds that, for purposes of condemnation pursuant to

---

decontaminated "to acceptable levels for transfer not requiring licensure" and that the AEC license number SUA–809 was terminated. That license authorized "possession, storage, and decontami-

nation only of the contaminated equipment and buildings constituting the Gunnison uranium mill," and transfer of certain mill equipment.

UMTRCA, fair market value must take into account the decontaminated value of the property; and (3) remanded for a new determination of just compensation. *The Mill v. Department of Health*, 868 P.2d 1099, 1105 (Colo.App.1993) (*The Mill III* ). CDH petitioned for review and we granted certiorari to review both the regulatory taking and eminent domain rulings.

## II.

The court of appeals affirmed the trial court's ruling that CHD correspondence issued to O.C. Coal and The Mill effected a total regulatory taking of The Mill's property. *The Mill III*, 868 P.2d at 1110. On certiorari review to this court, CDH argues that its letters to O.C. Coal and The Mill did not rise to the level of regulation and thus The Mill's regulatory taking claim must fail because it is not ripe. Furthermore, CDH argues, The Mill's inability to put the property to reasonable economic use was not a result of CDH's actions, but rather of the contamination on the property. For that reason, it argues, the claim should fail for lack of causation. CDH also contends that viable economic uses for the property remain, but, even if there were no remaining economic uses, any restrictions placed on the property by CDH did not effect a compensable taking under *Lucas v. South Carolina Coastal Council*, —— U.S. ——, ——, 112 S.Ct. 2886, 2901, 120 L.Ed.2d 798 (1992), because (1) the restrictions were consistent with background principles of nuisance and property law, and (2) the restrictions reflected recent scientific recognition of the hazards presented to human health by radioactive materials.

The Mill counters that because CDH records indicated that its property was not under license by CDH at the time of purchase and that the property had no use restrictions in place, the restrictions later imposed by CDH did not inhere in its title to the property. Furthermore, The Mill argues, its actual use of the property did not constitute common law nuisance because it complied with all of the CDH guidelines. The Mill also argues that even if CDH action did not effect a per se taking by depriving The Mill of all economic use of its property, a court must balance the competing public and private interests to determine whether a regulatory taking nevertheless occurred. Under this balancing test, The Mill asserts that the letters issued by CDH constituted a regulatory taking.

The court of appeals rejected CDH's ripeness argument and, upon weighing the public and private interests affected by regulation of The Mill's property, found that the restrictions placed on the use of the property by CDH effected a regulatory taking. We do not agree with the court of appeals' analysis.

■■■ A land-use regulation constitutes a taking under the Colorado and United States constitutions if it prevents all economically viable use of the property. *Lucas*, —— U.S. at ——, 112 S.Ct. at 2893; *Van Sickle v. Boyes*, 797 P.2d 1267, 1271 (Colo.1990). Regulation which does not prevent all economic use may also constitute a taking if it goes "too far." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). The determination of whether a regulation goes "too far" for purposes of the Fifth Amendment is essentially an "ad hoc, factual" inquiry. *Golden Pacific Bancorp v. United States*, 15 F.3d 1066, 1072 (Fed.Cir. 1994) (citation omitted), *cert. denied*, —— U.S. ——, 115 S.Ct. 420, 130 L.Ed.2d 335 (1994).

> The [Supreme Court], however, has identified several factors that should be taken into account when determining whether a governmental action has gone beyond "regulation" and effects a "taking." Among those factors are: "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations."

*Id.* (citing *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980); *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979); *Penn Central Trans. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)); *Kirk v. Denver Publishing Co.*, 818 P.2d 262, 268 (Colo.1991). The Supreme Court has recognized that in weighing these factors the force of the third factor may be

"so overwhelming ... that it disposes of the takings questions." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984). That is the case here.[3]

■ The "reasonable investment-backed expectations" of the regulated party is the dispositive factor in takings analysis when the regulated party is "on notice" of the extent of the government's regulatory authority. For example, in *Monsanto,* the Supreme Court found that Monsanto had no reasonable investment-backed expectations that data submitted to EPA would be kept confidential because "Monsanto was on notice of the manner in which EPA was authorized to use and disclose any data turned over to it by an applicant for registration." 467 U.S. at 1006, 104 S.Ct. at 2874. Similarly, the *Golden Pacific* court found "the highly regulated nature of the banking industry" to be dispositive of the taking issue. 15 F.3d at 1074. "Put most simply," the court wrote, "Golden Pacific could not have reasonably expected that the government 'would fail to enforce the applicable statutes and regulations.'" *Id.* (citation omitted). In short, expectations of unregulated use are unreasonable when an extensive regulatory scheme is in place at the time of investment.[4]

■ The Mill was "on notice" that the radioactive materials present on the property

were dangerous and highly regulated at both the state and federal level as was the use of the property itself.[5] While at the time The Mill purchased this property, scientific knowledge concerning the hazards of radiation was not as sophisticated as it is now, there nevertheless existed an awareness that the hazards posed by radiation were severe. The Colorado radiation control statute in effect at the time acknowledged that sites where radioactive materials are present "will represent a continuing and perpetual responsibility involving the public health, safety and general welfare." 1963 C.R.S. § 66–26–3(h) (1967 Supp.). As early as 1971, a Congressional subcommittee began to investigate the dangers presented by the use of uranium mill tailings for construction purposes. The evidence presented at those hearings led to a program in Colorado to remove tailings from sites and structures in Grand Junction in 1972. *See* H.R.Rep. No. 1480(I), 95th Cong., 2d Sess. 11–12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7433, 7434. Moreover, the facts stipulated to by the parties in the regulatory taking action indicated that The Mill knew that the entire property, including the mill yard, had been subject to federal licensing and regulation since 1962 due to the presence of radioactive contamination.

Although the parties also stipulated that, at the time The Mill purchased the property in 1973, the mill yard was authorized for

---

3. As the court of appeals recognized, the question of estoppel is subsumed in this analysis. Like investment-backed expectations, reliance on agency action must be reasonable before the agency is estopped from taking a contrary action. *Committee for Better Health Care v. Meyer,* 830 P.2d 884, 892 (Colo.1992); *P–W Investments, Inc. v. City of Westminster,* 655 P.2d 1365, 1373 (Colo.1982) (unreasonable to rely on mere issuance of water and sewer tap permits as a representation that service would be available indefinitely). Thus, by determining whether The Mill's expectations concerning the future regulation of its property were reasonable for purposes of takings analysis, we also resolve the question of whether CDH was estopped from taking a regulatory posture contrary to the position reflected in state records at the time The Mill purchased the property.

4. We note that *Monsanto* involved the regulation of personal property which, as the *Lucas* decision points out, traditionally has been subject to

a higher degree of state control than real property. However, the real property in this case was purchased with knowledge that it was a former uranium mill site with an existing trailings pile. As detailed *infra,* from the time milling operations were authorized on these sites, the sites became subject to tight controls more analogous to personal property regulation than to the limited levels of regulation traditionally applied to real property on which sensitive activities had never been conducted. Accordingly, we find that a distinction between the regulatory expectations of real and personal property owners is inappropriate in this case.

5. The record may support the trial court's finding that The Mill was unaware of contamination on the mill yard itself. However, the question before the court is whether The Mill's expectation that there would be no further regulation of the mill yard is reasonable. This determination does not depend on the subjective belief of The Mill. It is an objective determination.

unrestricted use, it is important to view that stipulation in context. Testimony in the record indicates that no specific restrictions were imposed on the mill yard insofar as CDH did not require The Mill to obtain a specific license for any portion of the property because CDH preferred to obtain compliance through voluntary means. The record also shows that there was some confusion in the department concerning whether the mill yard was subject to a general license. However, the authority to regulate this site was in place at the time of the purchase, whether or not it was exercised at that time.

To the extent that radioactive contamination in fact still existed on the property, it remained subject to broad regulatory authority. The Colorado radiation control statute gave CDH authority to "develop and conduct programs for evaluation and control of hazards associated with the use of any and all radioactive materials and other sources of ionizing radiation." 1963 C.R.S. § 66–26–3 (1967 Supp.) Comprehensive state regulations governing radioactive materials, specifically, maintenance of uranium mill tailings piles and the possession of radioactive material, were already in effect at the time the Mill purchased the property. *See* 6 C.C.R. 1007–1 (1970). At the time The Mill purchased the site, CDH sent copies of these regulations to the new owner and, after that, continued to monitor both the mill yard and the tailings pile.

Under these radiation control regulations, "[n]o person shall receive, use, possess, transfer or dispose of radioactive material except as authorized in a specific or general license issued pursuant to these regulations." RH 3.1, 6 C.C.R. 1007–1 (1970). The regulations imposed a "general license" that was "effective without the filing of applications with [CDH] or the issuance of licensing documents to particular persons" upon receipt of title to source material, e.g., "uranium or thorium, or any combination thereof, in any physical or chemical form." RH 1.6; RH 3.2; RH 3.3.3. Uranium mill tailings were exempt from these licensing requirements "provided they are in compliance with the provisions set forth in [the CDH regulations governing mill tailings]." RH 3.19.2.4. Under the regulations, CDH was authorized to "impose upon any licensee … such requirements in addition to those established in these regulations as it deems appropriate or necessary to minimize danger to public health and safety or property." RH 1.14. Likewise, licensees were required to allow CDH to inspect their facilities and sources of radiation on their property. RH 1.10. Given this regulatory environment, it is unreasonable for The Mill to claim it had no notice of the significant risk of further regulation of the site.[6]

▮▮▮ Just as a property owner "on notice" of government regulatory authority cannot reasonably expect to avoid regulation, neither can a property owner reasonably expect to put property to a use that constitutes a nuisance, even if that is the only economically viable use for the property. "In accord with ordinary intuition, government need not pay *even for complete takeover or destruction* if the latter is justified by the owner's insistence on using his property to injure other people or their property." Laurence H. Tribe, *American Constitutional Law* 593 (New York 1988) (citations omitted) (emphasis added). In particular, the Supreme Court holds that where a regulatory action

> does not proscribe a productive use that was previously permissible under relevant property and nuisance principles … [t]he use of these properties for what are now expressly prohibited purposes was *always* unlawful, and (subject to other constitutional limitations) it was open to the State at any point to make the implication of

---

**6.** Furthermore, evidence in the record indicates that The Mill may have had actual knowledge of this ongoing regulatory authority. In 1983, the mill owners received an inspection report from CDH stating that the inspection was performed under a general license pursuant to RH 3.2.1. Marcus Bishop was the general partner in The Mill responsible for inspecting CDH records prior to purchasing the property. When asked whether this report was the first indication that there was a general license in effect, he stated, "This is the first indication that I have in writing I have any recollection of. There may have been some conversations with some of the people about a general license, but it's an issue that is still vague to me. I still don't understand the general license."

those background principles of nuisance and property law explicit.

*Lucas,* —— U.S. at ——, 112 S.Ct. at 2901. Accordingly, the state may always restrict uses by regulation or statute when such uses previously were forbidden under common law principles. These uses were never part of the landowner's "bundle of rights that are commonly characterized as property." *Kaiser Aetna,* 444 U.S. at 176, 100 S.Ct. at 391. Thus, it is unreasonable for a landowner to expect that such uses would never be formally prohibited.

 The relevant Colorado common law principles would not permit a landowner to engage in activities that spread radioactive contamination.[7] Under Colorado common law, landowners have a duty to prevent activities and *conditions* on their land from creating an unreasonable risk of harm to others. *Moore v. Standard Paint & Glass,* 145 Colo. 151, 155, 358 P.2d 33, 36 (1960) (emphasis added). A public nuisance is the doing or failure to do something that injuriously affects the safety, health, or morals of the public or works some substantial annoyance, inconvenience, or injury to the public. Specifically, under Colorado common law, land uses that cause pollution constitute a nuisance. *Wilmore v. Chain O'Mines,* 96 Colo. 319, 325–26, 44 P.2d 1024, 1027 (1934) ("Whatever rights might be claimed by the defendant owners, they cannot justify the claim of a right to pollute the stream."). Under Colorado's nuisance statute enacted a year before The Mill purchased the processing site, "[a]ny unlawful pollution or contamination of any surface or subsurface waters ... or of the air" constitutes a nuisance. 1963 C.R.S. § 39–13–305. Improperly handled, radioactive materials in particular were treated as a public nuisance under Colorado

solid waste laws enacted before The Mill purchased the site. *See* 1963 C.R.S. § 36–23–10(d), –14 (1967 Supp.).

Under these principles of Colorado nuisance law, the right to make any use of the property that would create a hazard to public health by spreading radioactive contamination was excluded from The Mill's title at the onset. The radioactive contamination at the site was present as a result of prior uranium milling activities. It was a condition of the property that did not either arise or disappear as a result of any classification or correspondence issued by CDH. Accordingly, any use limitations suggested by CDH to avoid the spreading of radioactive contamination could not have constituted a taking because those uses were never lawfully available to The Mill even in the absence of CDH action.[8]

Based on this analysis, we conclude that the right to use the processing site in a way that would spread radioactive contamination did not constitute a reasonable investment-backed expectation.[9] Because we find The Mill's expectations to have been highly unreasonable, this factor is "so overwhelming" as to dispose of the taking issue for purposes of determining just compensation. *Monsanto,* 467 U.S. at 1005, 104 S.Ct. at 2874.

### III.

 Sections 25–11–301 to 305, 11A C.R.S. (1989), govern the state's participation in federal implementation of UMTRCA. Under section 303(d)(III), CDH is authorized to acquire a processing site by condemnation proceedings if necessary. § 25–11–303(d)(III). Fair market value in these proceedings is to be determined "in accordance with the criteria established in section 24–56–117(1)(c), C.R.S., and the provisions of the

---

7. Although the trial court did not address the question of whether CDH restrictions were consistent with the principles of nuisance and property law in existence at the time of The Mill's purchase of the processing site, this determination is a question of law that an appellate court may resolve independently. *See Evans v. Romer,* 854 P.2d 1270, 1274 (Colo.1993) (where an issue involves only legal and not factual questions, the lower court's judgment is subject to independent review by the appellate court).

8. Because we find that the uses restricted by CDH action were not within The Mill's reasonable expectations for use of the property, we will not address the questions of whether the CDH correspondence with The Mill rose to the level of regulation or whether CDH "regulation" destroyed all economic value in the property.

9. We agree that the Mill's actual use of the property did not constitute a nuisance, but that was precisely because The Mill complied with the CDH limitations.

federal 'Uranium Mill Tailings Radiation Control Act of 1978.'" *Id.* Section 24–56–117(1)(c), 10B C.R.S. (1988), codifies the Colorado rule against enhanced value. The rule requires the state to disregard any change in the fair market value of the property caused by the public improvement for which the property is being acquired in determining just compensation for the property. § 24–56–117(1)(c).[10]

▮▮▮▮▮▮ In the eminent domain action, the court of appeals found that the stipulation entered into by The Mill and CDH setting the fair market value of The Mill's property in its contaminated state at zero was dictated by the rule against enhanced value and set aside the stipulation. Because application of the rule would limit The Mill's compensation to the value of the property in its contaminated state, the court concluded that the rule against enhanced value was contrary to the intent of UMTRCA and resulted in unfair and disparate treatment of the owners of designated sites. *The Mill III,* 868 P.2d at 1103. Specifically, the court found that the financing scheme of UMTRCA indicated an intent that property owners pay nothing for cleanup, and thus, for the state to collect the difference between the contaminated and decontaminated property values would be contrary to the intent of the statute. *Id.*[11] It found further that the Colorado implementation scheme under UMTRCA resulted in disparate treatment of similarly-situated property owners, since those whose property is cleaned up by consensual agreement pay nothing, while property owners whose property is acquired by the state must repurchase their property at its market value in a decontaminated state. *Id.* The court of appeals declined to follow its prior decision in *Department of Health v. Hecla Mining Co.,* 781 P.2d 122 (Colo.App.1989), to the extent

10. The statute provides that

Before the initiation of negotiations for acquisition of real property, an amount shall be established which it is reasonably believed is just compensation therefor, and such amount shall be offered for the property. In no event shall such amount be less than the approved appraisal of the fair market value of such property. Any decrease or increase in the fair market value of real property prior to the date of valuation caused by the public improvement for which such property is acquired, or by the likelihood that the property would be acquired for such improvement, other than that due to physical deterioration within the reasonable control of the owner, shall be disregarded in determining the compensation for the property. The owner of the real property to be acquired shall be provided with a written statement of and summary of the basis for the amount established as just compensation. Where appropriate, the just compensation for the real property acquired and for damages to remaining real property shall be separately stated.

§ 24–56–117(1)(c), 10B C.R.S. (1988).

11. The court of appeals also found it contrary to the intent of UMTRCA that site owners invariably would lose their initial investment under the rule against enhanced value. The court erroneously assumed that application of the rule against enhanced value would dictate a finding of nominal or zero market value in condemnation actions pursuant to UMTRCA so that owners always would lose their initial investment in the property, as well as be forced to repurchase their property at fair market value after decontamination was completed.

The rule against enhanced value requires only that the property be valued in its present condition without regard to any increase or decrease in value projected upon completion of the government project for which the property was condemned. *See* § 24–56–117(1)(c). It does not mean that a property owner will necessarily lose the initial investment in the property. As discussed *infra,* site acquisition is envisioned under UMTRCA in those instances where the initial purchase price of the property reflected on-site contamination. Presumably, the rational and informed site owner would not have purchased the site unless some use or value remained despite the contamination. The fair market value determined under the rule would reflect the more-than-nominal value of those uses. Moreover, if the site owner purchased the site at a price that reflected on-site contamination, the value determined under the rule would allow the owner to recover that initial investment.

In this case, the value of the property was set at zero by stipulation of the parties; it was not dictated by state law. The Mill took what it thought was the best strategic position on property value, and forfeited its initial investment as a result of that strategy. Neither the court of appeals' prior decision in *Department of Health v. Hecla Mining Co.,* 781 P.2d 122 (Colo.App.1989), nor the rule against enhanced value allows the state to condemn a site and then pay less than fair market value of the property at that time. Accordingly, we will address only whether it is consistent with UMTRCA to apply the rule against enhanced valuation to condemnation actions to the extent that it excludes compensation for any *increased* value resulting from remedial action by the government.

it was inconsistent with its ruling in this case. We do not agree.

In addressing and rejecting the court of appeals' analysis, we will examine first the alleged conflict between Colorado's enhanced value statute and the federal law. Then we will consider the equal protection implications caused by application of the rule against enhanced value.

## A.

### Inconsistency with the Federal Statute

 Under the Supremacy Clause of the United States Constitution, state statutes that conflict with federal statutes are invalid. *Brubaker v. Board of County Comm'rs*, 652 P.2d 1050, 1054 (Colo.1982); *Housing Auth. v. United States*, 980 F.2d 624, 631 (10th Cir.1992). Federal law preempts state law when Congress expresses clear intent to preempt state law; when there is outright or actual conflict between federal and state law; when compliance with both federal and state law is physically impossible; when there is an implicit barrier within federal law to state regulation in a particular area; when federal legislation is so comprehensive as to occupy the entire field of regulation; or when state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *Frontier Airlines, Inc. v. United Air Lines, Inc.*, 758 F.Supp. 1399, 1407 (D.Colo.1989). However, exercise of federal supremacy is not to be presumed lightly. *Brubaker*, 652 P.2d at 1055. We must begin by assuming that the historic police powers of the state are not to be superseded by any federal laws or regulations unless that congressional purpose is clearly shown. *Dantus v. First Federal Savings & Loan Ass'n*, 502 F.Supp. 658, 660 (D.Colo.1980).

 In construing statutes to make this determination of Congressional objectives in enacting UMTRCA, we must give effect to the intent reflected in the language of the enactment and the legislative process. *Colorado v. Idarado Mining Co.*, 916 F.2d

1486, 1494 (10th Cir.1990). Congressional intent is determined primarily from the plain language of the statute, and secondarily from the statute's legislative history. *Mass v. Martin Marietta Corp.*, 805 F.Supp. 1530, 1534 (D.Colo.1992).

 The court of appeals found that the Colorado rule against enhanced value is an obstacle to the accomplishment and execution of the objectives of UMTRCA. We do not agree. We find that both the plain language of UMTRCA and its legislative history indicate a legislative intent not inconsistent[12] with the Colorado rule against enhanced value which requires that property subject to condemnation proceedings be valued in its unimproved state. *Williams*, 147 Colo. at 198–202, 363 P.2d at 173–75; § 24–56–117(1)(c).

### 1.

### The Language of the Federal Statute

Turning first to the plain language of the statute, the stated purpose of UMTRCA is to clean up and stabilize uranium processing sites to alleviate the danger to the public posed by radiation emitted from mill tailings and other radioactive waste at such sites, 42 U.S.C. § 7901. To this end, the federal government "shall pay 90 per centum of the actual cost of such remedial action, including the actual costs of acquiring such site (and any interest therein) ... and the state shall pay the remainder of such costs from non-Federal funds." § 7917(a).

 The act addresses two possible cleanup scenarios: cleanup with the consent of the property owner, section 7913(c), and cleanup accomplished after the acquisition of the site by the state in which the property is located, section 7914(a). In deciding whether to proceed by one method or the other, the sole factor enumerated in the statute to which the federal Secretary of Energy and the Nuclear Regulatory Commission must give consideration is the "prevention of windfall profits" to the property owner. *Id.* If

---

**12.** Because Supremacy Clause analysis begins with the assumption that state regulation is *not* superseded by federal regulation, *Brubaker*, 652 P.2d at 1054, *Dantus*, 502 F.Supp. at 660, the court need not find that the federal and state statutes are consistent, only that they are *not inconsistent*.

the cleanup will result in a windfall to the property owner, the state will be directed to acquire the site, *id.,* with the option to sell the decontaminated property back to the original owner at fair market value. § 7914(e)(2). If the state is not directed to acquire the site, the state may enter into a consent agreement with the property owner which will "releas[e] the United States of any liability or claim thereof" and "hold[ ] the United States harmless against any claim ... arising out of the performance of any such remedial action." § 7913(c)(2). UMTRCA thus distinguishes between property owners to whom a windfall benefit would accrue and property owners to whom a windfall would not accrue in determining which cleanup scenario to follow.

> The Mill argues that
>
> [t]he perceived 'windfall' is the cost associated with the remedial action undertaken by DOE which otherwise could have been borne by the property owner. However, [UMTRCA's] specific purpose is to obligate DOE to absorb these costs, since 'but for' the Federal contracts which gave rise to the tailings which contaminate these sites, the properties would likely be free from uranium contamination.

According to The Mill, the admonition against windfall profits in section 7914(a) is merely an attempt to limit costs. It does not mandate differential treatment of property owners whose property is remediated by consent and those whose property is acquired by the state before remediation.

UMTRCA does not define "windfall profits." Neither the Department of Energy nor the Nuclear Regulatory Commission has issued regulations enunciating the factors on which it bases its determination to require a state to acquire a processing site, or elaborating how "windfall profits" may be identified. Thus, we must interpret the term without statutory or regulatory guidance.

■ In reading a statute we are required to adopt an interpretation that gives "consistent, harmonious and sensible effect" to all of the statute's provisions. *Colorado State Bd. of Medical Examiners v. Saddoris,* 825 P.2d 39, 42 (Colo.1992) (citation omitted). Furthermore, the court must give words their commonly accepted and understood meaning. *East Lakewood Sanitation Dist. v. District Court,* 842 P.2d 233, 235 (Colo.1992).

■ The Mill's interpretation fails to "sensibly" and "harmoniously" construe the statute. First, if the windfall profit addressed by UMTRCA is merely the cost of remedial action, including acquisition costs, then it would be impossible to consider "prevention" of windfall profits as required by section 7914, since all cleanup effort would result in some windfall to the property owner. The Secretary of Energy and the Nuclear Regulatory Commission could only consider "limitation" of windfall profits. Second, to treat "windfall profits" as the cost of cleanup, as The Mill recommends, would read consensual cleanup under section 7913(c) out of the statute. Since all remedial action would result in some windfall profit, prevention of which is the sole enumerated factor for consideration under section 7914(a), presumably the Secretary of Energy and the Nuclear Regulatory Commission would require acquisition of most, if not all, sites. Finally, The Mill's interpretation also fails to acknowledge that property owners may benefit not only from avoiding the cost of cleanup (including future liability arising from on-site pollution), but also from the increased value of the property after the government-funded cleanup is complete. While the statute clearly is designed to require federal and state government to bear the cost of cleanup, there is no evidence that it was intended to provide these secondary benefits to landowners as well. Accordingly, we must identify a satisfactory alternative construction.

■ A "windfall" is commonly understood to mean "an unexpected or sudden gain or advantage." *Webster's Third New International Dictionary* 2619–20 (1986). "Profit," in the context of financial matters such as these, generally means the "the excess of returns over expenditure in a transaction or series of transactions." *Id.* at 1811. Thus, "windfall profit" must occur where a transaction produces some unexpected excess of returns over expenditures. In the context of this statute, the transaction in question must be the acquisition of property by the state

since, under section 7914(a), it is "[i]n determining whether to *require the State to acquire a designated processing site* or interest therein, [that] consideration shall be given to the *prevention of windfall profits."* § 7914(a) (emphasis added).

 Under this definition, windfall profits would accrue to a property owner as a result of cleanup only where the property owner purchased the property in its contaminated state at a price which reflected the presence of contamination and then, without making any expenditures for cleanup, could resell the property, or interest therein, at a price reflecting an increase in value due to the cleanup. Such an increase in market value due to cleanup would necessarily be unexpected, and thus a "windfall," because if government-funded cleanup plans had been publicly known, the market price of the property in a contaminated state would have been comparable to that of similar, uncontaminated property.

Not all cleanups would result in such a windfall to the property owner. For example, where the property owner purchased the tract in an uncontaminated state before the milling operations took place pursuant to federal contracts, cleanup of the property merely returns the property to its state at the time of initial purchase.[13] The same would be true where the property owner purchased the tract after the decision to take remedial action had been made or after remedial action had begun, so that the purchase price reflected the decontaminated value of the property. Presumably, in these circumstances the Secretary of Energy and the Nuclear Regulatory Commission would not require the state to acquire the processing site prior to performing remedial action.

 The rule against enhanced value is not inconsistent with UMTRCA's policy of preventing windfall profits to the property owner. In fact, the rule furthers UMTRCA policy. If the property owner were allowed to collect the value of the property in its decontaminated state, the property owner would not only be spared the expense of the cleanup, but would also receive the increase in market value resulting from the cleanup. While the statute does not require property owners to pay for the cleanup itself, as indicated by placing the full cost on the federal and state governments in section 7917(a), the rule against enhanced value assures that the property owner cannot collect through condemnation proceedings the "windfall profits" that state acquisition of the property was intended to prevent.

2.

The Legislative History of
the Federal Statute

 The legislative history of UMTRCA does not define "windfall profits," or address the criteria for acquisition of processing sites. However, nothing in the legislative history indicates that the Colorado rule against enhanced value is inconsistent with UMTRCA. In its "Section–by–Section Analysis and Committee Comments," House Report No. 1480 states that the "affected State [shall] acquire the processing site before remedial action is initiated if such acquisition is determined appropriate by the Secretary and the NRC." H.R.Rep. No. 1480(II) at 37, *reprinted in* 1978 U.S.C.C.A.N. 7464. The Report specifically indicates that "[s]uch acquisition is to be accomplished pursuant to State law." *Id.* This reference to state law indicates that Congress intended for the state to utilize the same policies and proce-

---

13. The uranium mill tailings addressed under UMTRCA were produced by uranium milling operations under federal contracts. Because at the time milling operations were underway the tailings were not believed to be a health hazard, federal cost-plus contracts allowed for only a very small expenditure for tailings disposal. Profit margins under the contracts did not accommodate the cleanup expenses now recognized as necessary to assure public safety. H.R.Rep. No. 1480(II) at 58, *reprinted in* 1978 U.S.C.C.A.N. 7477–78.

Increased property value that accrues to these property owners as a result of remedial action does not constitute a windfall profit because (1) on-site hazardous contamination resulted in a decrease in property value after purchase of the site which offsets the increase in value created by cleanup; and (2) cost compensation calculated under federal cost-plus contracts during milling operations did not account for decontamination expenses. Governmental cleanup thus does not result in an unexpected double-benefit to these property owners.

dures in this context as it uses in other types of land acquisition. In Colorado, the rule against enhanced value is generally applicable to the acquisition of land by the state in other contexts. *See* § 24–56–117 ("Any state agency or political subdivision of the state which acquires real property for a program or project for which federal financial assistance will be available to pay all or any part of the cost of such program or project shall comply with the following policies:"); *Williams,* 147 Colo. at 198–202, 363 P.2d at 173–75.

The committee also noted that where cleanup is accomplished by consent,

> the property owner will benefit from the voluntary remedial action provided by this act. Clearly, the committee does not want to find that at some later date the United States is faced with a claim from such owner, his heirs, successors or assigns concerning such remedial action or arising from such action.

H.R.Rep. No. 1480(II) at 37, *reprinted in* 1978 U.S.C.C.A.N. 7464. Thus, the committee viewed the waiver of liability that is part of a consent agreement to be at least partial consideration for the benefit that accrues to the property owner. Under the interpretation urged by The Mill, the property owner would receive not only the benefit of the cleanup and the attendant increase in property value, but would also avoid providing a waiver releasing the United States from liability which otherwise would have been required if the site had been decontaminated under a consent agreement. Such an interpretation would create every incentive for a property owner to resist consensual cleanup, force the state to condemn the processing site in order to perform remedial action, and thus drive up program costs. Since the committee was "concerned about the cost of acquisition under this section and expect[ed] that it be utilized only when necessary," H.R.Rep. No. 1480(II) at 38, *reprinted in* 1978 U.S.C.C.A.N. 7465, such a construction is clearly contrary to the legislative intent of UMTRCA as expressed in the Act's legislative history. Application of the rule against enhanced value would eliminate this adverse incentive and thus be more consistent with Congressional intent.

### B.

### Equal Protection

The court of appeals found that applying traditional condemnation rules, such as the rule against enhanced value, to property acquisitions under UMTRCA resulted in disparate treatment of similarly-situated property owners. This result, the court found, is "further evidence that the traditional enhancement rule was not intended to apply under UMTRCA." *The Mill III,* 868 P.2d at 1105. Because we find that property owners whose property is subject to condemnation proceedings and property owners whose property is subject to consensual remedial cleanup are not similarly situated, we disagree.

The equal protection guarantees under the Colorado and United States constitutions assure like treatment of all who are similarly situated. Colo. Const. art. II, § 25; U.S. Const. amend. 14.; *Mayo v. National Farmers Union Property and Casualty Co.,* 833 P.2d 54, 57 (Colo.1992). If persons alleging disparate treatment are not similarly situated, the equal protection challenge to a statute must fail. *Western Medical Lath, Inc. v. Acoustical & Constr. Supply, Inc.,* 851 P.2d 875, 880 (Colo.1993).

As discussed above, the decision to acquire property, as opposed to entering into a consensual arrangement for cleanup, is based on the prevention of windfall profits to the property owner. By agreement with the federal government, the state is required to acquire only those processing sites where the Secretary of Energy and the Nuclear Regulatory Commission already have made a threshold determination that the owners would stand to make a windfall profit if remedial action were to proceed under a consensual agreement. This finding alone indicates that the two groups of property owners are not similarly situated. Accordingly, any equal protection challenge to the application of the rule against enhanced value must fail.

After this examination of the language and legislative intent of UMTRCA, we conclude

that the rule against enhanced value codified in section 24–56–117(1)(c) is fully consistent with Congressional intent in enacting UMTRCA.

## IV.

For the foregoing reasons, we find that 1983 correspondence between CDH and The Mill did not constitute a regulatory taking in violation of the United States and Colorado constitutions. We also find that application of the Colorado rule against enhanced value in condemnation proceedings is not contrary to the intent of UMTRCA, and thus, that the stipulation of zero value entered into by The Mill and CDH may stand. Accordingly, we (1) reverse the court of appeals' holdings on both issues, (2) return the case to the court of appeals for remand to the district court with instructions to dismiss The Mill's regulatory taking and estoppel claims, and (3) return the case to the court of appeals for reinstatement of the judgment of the Gunnison County District Court granting title to the property to CDH.

ERICKSON, J., specially concurs.

SCOTT, J., dissents.

Justice ERICKSON specially concurring:

We granted certiorari to review both the regulatory taking and eminent domain rulings in *The Mill v. State of Colorado, Department of Health,* 868 P.2d 1099 (Colo.App. 1993).[14] I agree with the majority that the court of appeals erred in finding a regulatory taking of The Mill's property. I also agree that the enhanced value statute, section 24–56–117(1)(c), 10B C.R.S. (1988), is dispositive in this case in determining whether the decontaminated value of a property should be considered for purposes of eminent domain pursuant to the Uranium Mill Tailings Radiation Control Act (UMTRCA), 42 U.S.C. §§ 7901–7942 (1993 Supp.). I concur in the majority opinion and write separately on the applicability of the enhanced value rule in this case.

## I

The 61–acre parcel of land (property) at issue in this case consists of a 25–acre mill yard and a 36–acre tailings pile. Pursuant to an Atomic Energy Commission (AEC) license, the property was operated as a uranium processing mill and for storage of uranium mill tailings from the late 1950s until 1962. In 1968, the AEC delegated regulatory authority of the radioactive materials and the AEC license to the State of Colorado, which terminated the license for the property in issue that adjoins the Gunnison Airport.

The Mill purchased the property in 1973. At that time, the Colorado Department of Health (CDH) had imposed no restrictions on the use of the property. Radioactive contamination of the mill yard was found in 1976. In 1978, Congress enacted UMTRCA to decontaminate twenty-two inactive uranium mills to protect the public from the health hazards associated with the radioactivity of uranium mills. After radioactive contamination of the property was confirmed in 1980 and 1982, The Mill leased the property to O.C. Coal Company in 1983. The Mill notified CDH of the lease agreement, and CDH responded with a letter advising The Mill and O.C. Coal of safety precautions that were recommended because of the radioactive contamination of the property.

O.C. Coal terminated the lease in 1984. The Mill contends that the CDH letters setting forth safety requirements caused O.C. Coal to terminate the lease and brought an action against CDH in 1986, claiming a regulatory taking. While the regulatory takings case was on appeal, CDH initiated a condemnation proceeding in accordance with UMTRCA and the applicable Colorado statute. § 25–11–303(1)(d), 11A C.R.S. (1989 & 1994 Supp.). In the condemnation action under UMTRCA, the parties stipulated that the market value of the property in its contaminated state was zero, and the trial court vested title to the property in CDH. The

---

14. We previously reviewed inverse condemnation and regulatory taking issues in *State of Colorado, Department of Health v. The Mill,* 809 P.2d 434 (Colo.1991) and remanded to the district court for further consideration of promissory estoppel and regulatory taking claims asserted by The Mill.

Mill appealed both the regulatory taking and the condemnation decisions to the court of appeals.

The court of appeals consolidated the regulatory takings case with the eminent domain case. In the consolidated appeal, the court of appeals held that a regulatory taking had occurred and set aside the stipulation of the parties that the fair market value of the property in its contaminated state was zero. On remand, the court of appeals directed that fair market value be determined based on the decontaminated value of the property, and ordered a new determination of just compensation.

## II

In *Department of Health v. Hecla Mining Co.,* 781 P.2d 122, 125 (Colo.App.1989), the court of appeals stated: "We do not find support in the federal law for [the] assertion that the purpose of [UMTRCA] is to meet an obligation to remedy government-initiated contamination." [15] The legislative history of UMTRCA reflects a congressional intent not to overburden either the federal or state governments with the costs of clean-ups.[16] Rather than protecting the investment of the property owner, Congress' concern was to minimize the costs of the program in cleaning up radioactive uranium sites.[17]

*Hecla* set out the key elements of the legislative history and stated:

The legislative history shows that the Radiation Control Act was enacted due to concern over the health threat posed by unstable and uncontrolled inactive uranium mill tailings and *not* to meet any legal obligation on the part of the federal government to remedy the hazardous situations at such sites. Concern over costs of the program prompted Congress to provide for state acquisition of mill sites, particularly if decontamination would result in windfall profits to an owner who retained the site after decontamination.

*Hecla,* 781 P.2d at 124. The court of appeals in *Hecla* held that in a condemnation proceeding, property must be valued in its present condition, without regard to the governmental purpose supporting the necessity for condemnation or the radioactive contamination of the property. *Accord, Williams v. City and County of Denver,* 147 Colo. 195, 363 P.2d 171 (1961); § 24–56–117(1)(c).

In a condemnation proceeding, the property taken is valued at its fair actual cash market value at the time of trial or when the property is taken. § 38–1–114, 16A C.R.S.

---

**15.** The court of appeals in *Hecla* subsequently stated:

The [UMTRCA] ... expressly set forth, as the purpose for the legislation, the protection of the public health, safety, and welfare from the potential and significant radiation health hazards of uranium mill tailings.... This is an undisputable public purpose....

*Id.* (citations omitted); *see* 42 U.S.C. § 7901(b)(1) (stating that the purpose of the UMTRCA is "to stabilize and control ... tailings in a safe and environmentally sound manner and to minimize or eliminate radiation health hazards to the public....").

**16.** The UMTRCA divides the costs of decontamination between the federal government (90%) and state government (10%). 42 U.S.C. § 7917(a). In contrast, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675 (1993 Supp.), imposes liability upon "the owner and operator of a ... facility," or "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of...." §§ 9607(a)(1)–(2).

The Mill is also subject to federal legislation that imposes liability on mill owners for noncompliance with radon emission standards. 40 C.F.R. § 61.222(b) (1993). The cost of decontamination of The Mill property has been estimated at $40 million.

**17.** Such a concern eliminates the disparate appearance of the two decontamination options provided in UMTRCA. A contaminated site may be cleaned up either (1) through an agreement with the owner, 42 U.S.C. § 7913(a), or (2) by purchase or condemnation when the Secretary of Energy, with the concurrence of the Nuclear Regulatory Commission, determines that decontamination would lead to "windfall profits" for the owner. 42 U.S.C. §§ 7914(a) and (e)(2).

The two options are intended to reduce the costs of the program to the public by preventing the receipt of "windfall profits" to landowners. Allowing owners such as The Mill to recover the uncontaminated value of their land, after purchasing the property in a contaminated condition, would provide the owners a windfall and would increase the cost of the program, contrary to congressional intent.

(1982 & 1994 Supp.); *see Mulford v. Farmers' Reservoir & Irrigation Co.*, 62 Colo. 167, 161 P. 301 (1916). Market value is the price a property will bring when it is offered for sale by one who desires but is not obligated to sell, and is bought by one who desires, but is under no necessity to buy the property. *Dep't of Highways v. Schuloff*, 167 Colo. 72, 445 P.2d 402 (1968). The value of the land taken is based on present conditions and not on the future development of the property. *Id.*

When Congress enacted UMTRCA, it directed that acquisitions be accomplished pursuant to state law. H.R.Rep. No. 95–1480(II), 95th Cong., 2d Sess. at 37 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7464. When the Colorado General Assembly agreed to the financial commitments of UMTRCA and authorized the CDH to participate in its implementation, it specifically directed that such acquisitions be conducted pursuant to the eminent domain laws of Colorado. § 25–11–303(1)(d). In particular, the General Assembly directed that the enhanced value criteria in section 24–56–117(1)(c), be followed when condemning property under UMTRCA. Section 24–56–117(1)(c) provides in relevant part: "Any decrease or increase in the fair market value of real property prior to the date of valuation caused by the public improvement for which such property is acquired ... shall be disregarded in determining the compensation for the property." Section 24–56–117(1)(c) is the statutory codification of the rule against enhanced value. *See Williams*, 147 Colo. at 199–200, 363 P.2d at 173–74. The court of appeals dismissed section 24–56–117 as "general policy" that must yield to what the court stated was the "ends" of UMTRCA (protecting the owner's investment). *The Mill*, 868 P.2d at 1106.

The UMTRCA is not an exception to the enhanced value rule, but rather incorporates the rule into its framework. In *Hecla*, the court of appeals held that evidence of the decontaminated value of the land, "because it fails to reflect the actual condition of the property at the time of the taking, is neces-

sarily speculative or prospective and thus inadmissible." *Hecla*, 781 P.2d at 126. The court of appeals in the present case declared that *Hecla* was dispositive of value determination of fair market value and of the issues raised at the immediate possession hearing, but held that the enhanced value rule in *Williams* was inapplicable and that *Hecla* would not be followed as inconsistent with the scheme established by UMTRCA. The court of appeals misinterpreted UMTRCA, and erred in not following *Hecla*.[18]

The enhanced value statute is dispositive of the condemnation issue. The contaminated value of the land was zero. The Mill, in acquiring the property, knew of the property's prior use as a uranium processing mill, which contaminated both the building and the soil. The Mill was effectively limited in the use it could make of its land because of radioactive contamination. Such a limitation on use is not compensable, however, because the only value of The Mill's property would be as the result of improvements effected by a clean-up that would restore the land to its former condition. The property was contaminated when it was acquired by The Mill. Because the cost of decontaminating the property exceeds the value of the property after the clean-up, the value of the property is zero, and the rule against enhanced value is applicable.

### III

The cost of decontaminating The Mill's property is borne by the state and federal governments. A consideration of the property's decontaminated state for purposes of calculating fair market value would grant The Mill more than it acquired when it purchased the property in 1973, and would grant the landowner "windfall profits," profits which Congress intended to avoid in enacting UMTRCA.

Because an application of the rule against enhanced value is in accordance with congressional intent and the intent of the Gener-

---

**18.** Judge Smith authored the opinion of the court in *Hecla* and the court of appeals opinion in this case, but the other members of the panel were not the same. The court of appeals panel in this case erred in applying a different interpretation of the UMTRCA than a different panel employed in *Hecla*.

al Assembly, the court of appeals erred in ordering a determination of the property's decontaminated value and in not following *Hecla*. The court of appeals also erred in setting aside the parties' stipulation that the property had no value in its present condition.

Justice SCOTT dissenting:

The majority holds that The Mill, the owner of real property, did not have "reasonable investment-backed expectations" as to the contemplated use of the "mill yard" because "an extensive regulatory scheme [was] in place at the time of investment," maj. op. at 999–1000, and, as a consequence, any taking by the State does not require compensation. Because I believe such a rule impermissibly blurs the distinction between takings of real and personal property and improperly permits takings without compensation in violation of constitutional mandates, and because I believe the record does not support a conclusion that The Mill's expectations were "highly unreasonable," I respectfully dissent.

Moreover, because the lower court's determination that The Mill was deprived of its entire economic interest in the property is supported by the record, I would hold the actions of the State compensable, assuming The Mill can establish a regulatory taking premised upon its compliance with directives set forth in agency letters and similar communications. Accordingly, because the analysis I would employ requires that we examine the issues the majority fails to address, I respectfully dissent.[19]

I

In 1973, respondent, The Mill, purchased a lot in Gunnison, Colorado, which had previously been used as a uranium mill and disposal site for uranium mill tailings. The lot was divided into two separate parcels: the "tailings pile" and the "mill yard." Prior to purchasing the lot, The Mill searched the records of the Colorado Department of Health (CDH) and discovered that in 1971, the State of Colorado had removed the mill yard from licensure, authorized its unrestricted use, and considered the mill yard not contaminated and free for lawful uses such as those contemplated by The Mill.[20] Based on its review of the information in CDH's files, which indicated that the mill yard parcel was decontaminated and safe for unrestricted use, The Mill purchased the subject property in July of 1973.

From 1973 to 1978, CDH conducted various tests of the tailings pile located on property adjacent to The Mill. At some point, CDH also conducted tests of the mill yard. In 1976, CDH found radioactive contamination throughout the mill yard. At that time, CDH informed The Mill of its finding and advised it to take precautionary measures with regard to the mill yard. Both the mill yard and the tailings pile were designated for radiation clean-up under the Uranium Mill Tailings Radiation Control Act of 1978, Pub.L. No. 95–604, 42 U.S.C. § 7901 (1991) ("UMTRCA"). The Mill was informed that it was a "candidate for remedial action" in 1978.

In 1983, The Mill notified CDH that it had leased the mill yard to O.C. Coal. CDH then sent several letters to both The Mill and O.C. Coal informing them of the "existing mill yard radioactive contamination" and the limited uses to which the mill yard could be put. The trial court found that there had been a taking because of the letters and other actions of CDH, and awarded compensation in the amount of $200,000, based on a total loss of use, rather than a loss of property valuation.

**19.** I do not address the issues raised in the eminent domain action because it would be premature in light of my analysis of the takings issue.

**20.** The mill yard had been licensed in 1964 by the Atomic Energy Commission (AEC). Pursuant to the license, the property was authorized: "[f]or storage only of the contaminated equipment and buildings constituting the Gunnison uranium mill. This license does not authorize removal, use, transfer or decontamination of the equipment and/or buildings in any manner." In 1968 the license was amended to allow for transfer of contaminated equipment to persons not possessing an AEC license provided that decontamination was accomplished in accordance with the AEC standards. Decontamination of equipment and buildings was also authorized.

The court of appeals affirmed the trial court's ruling that the CDH correspondence amounted to a total regulatory taking. A majority of this court now reverses, and, in effect, ignores the distinction so clearly drawn between real and personal property in federal takings jurisprudence and, in its place, holds that the adoption of "an extensive regulatory scheme" trumps the fundamental constitutional right to just compensation as a consequence of a government taking. It is to that conclusion of the majority that I take exception.

## II

In *Lucas v. South Carolina Coastal Council,* —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the United States Supreme Court reaffirmed its holding in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), where Justice Holmes, writing for the Court, opined that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Lucas,* —— U.S. at ——, 112 S.Ct. at 2893 (citing *Mahon,* 260 U.S. at 415, 43 S.Ct. at 160). Writing for the majority in *Lucas,* Justice Scalia acknowledged that the seventy years of Supreme Court takings jurisprudence has been essentially by ad hoc, factual inquiries. The Court has, however, found regulatory takings "compensable without case-specific inquiry into the public interest advanced in support of the restraint" in instances in which it has "found . . . regulation [by the state] denied all economically beneficial or productive use of land." *Id.* (citing *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987); *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 495, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987); *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 295–96, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981) (footnote omitted)).

In fact, the Court has categorically held that takings which deny all economically beneficial use require compensation. Noting this categorical rule, Justice Scalia suggested the justification for the rule was "simply, as Justice Brennan suggested, that total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation." *Lucas,* —— U.S. at ——, 112 S.Ct. at 2894 (citing *San Diego Gas & Elec. Co. v. San Diego,* 450 U.S. 621, 652, 101 S.Ct. 1287, 1304, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting)). Essentially, then, Justice Scalia opined, "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Lucas,* —— U.S. at ——, 112 S.Ct. at 2895.

On appeal to this court, CDH argued, and the majority agreed, that the court of appeals erred by failing to apply the exception stated in *Lucas* that no compensation is due if the restrictions merely duplicate the result that could have been achieved in the courts through nuisance or property law. *Lucas,* —— U.S. at ——, 112 S.Ct. at 2901. That exception only applies, however, where the "owner is barred from putting land to a use that is proscribed by those existing rules or understandings." *Id.* The *Lucas* Court established that "[w]here the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title *to begin with.*" *Id.* at ——, 112 S.Ct. at 2899 (emphasis added). At the time The Mill purchased the land in 1973, the contemplated use of the land (storage) was not proscribed by any rules or understanding that existed at that time. The anticipated investment-backed use of The Mill property was not unlawful, since the State itself had declared the property authorized for unrestricted use. By its actions in 1983, however, the State was in effect changing the uses and hence, in effect, understandings that reflect a more developed understanding of the hazards of radiation— all of which occurred years after the purchase. Thus, the *Lucas* exception that "the proscribed use interests were not part of [The Mill's] title to begin with," i.e., in 1973, has no application to the case at hand.

Importantly, despite its early infatuation with "harmful or noxious uses," or reliance upon nuisance law, the *Lucas* Court reversed the South Carolina Supreme Court because its judgment was premised upon a determination that the property owner's proposed use was a nuisance, harmful to the public, and, as a consequence, would render a taking not subject to compensation. *Lucas*, —— U.S. at —— – ——, 112 S.Ct. at 2897–98. Instead, the Court reasoned, "noxious-use logic cannot serve as a touchstone to distinguish regulatory 'takings'—which require compensation—from regulatory deprivations that do not require compensation." *Id.* at ——, 112 S.Ct. at 2899. Continuing, the Court held: "*A fortiori* the [state's] recitation of a noxious-use justification cannot be a basis for departing from *our categorical rule that total regulatory takings must be compensated.*" *Id.* (emphasis added). The majority fails to take this holding into account.[21]

### III

The United States Supreme Court has identified several factors that should be taken into account when determining whether a governmental action amounts to a taking. Among those factors are "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741 (1980). I would agree with the majority that the reasonable investment-backed expectations of the regulated party is a dispositive factor in this case. I would disagree, however, with the majority's conclusion that The Mill's expectations in 1971 were unreasonable, in light of the CDH determination that the property was not contaminated and was available for unrestricted use. With respect to owner expectations, the *Lucas* Court stated:

> Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with. This accords, we think, with *our "takings" jurisprudence, which has traditionally been guided by the understandings of our citizens regarding the content of and the State's power over the "bundle of rights" that they acquire when they obtain title to property.*

*Lucas*, —— U.S. at ——, 112 S.Ct. at 2899 (emphasis added). Continuing the concept of owner expectations, the Court noted a distinction between personalty and realty:

> And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even render his property economically worthless.... In the case of land, however, we think the notion ... that title is somehow held subject to the "implied limitation" that the State may subsequently eliminate all economically valuable use is inconsistent with the historic compact recorded in the Takings Clause that has become part of our constitutional culture.
>
> *Where "permanent physical occupation" of land is concerned, we have refused to allow the government to decree it anew (without compensation) no matter how weighty the asserted "public interest" involved.... We believe similar treatment must be accorded confiscatory regulations,*

---

**21.** The majority in this case emphasizes principles of nuisance law in its holding, stating "under Colorado common law, land owners have a duty to prevent activities and conditions on their land from creating an unreasonable risk of harm to others." Maj. op. at 1002. The majority sets forth further, "[i]n accord with ordinary intuition, government need not pay *even in complete takeover or destruction* if the latter is justified by the owners insistence on using his property to injure other people or their property." Maj. op. at 1001 (citing Laurence H. Tribe, *American Constitutional Law* 593 (New York 1988)).

In the nuisance cases relied on by the majority it was the conduct of the owner of the property that caused the nuisance, not the character of the property itself, over which the owner had no control. In the case at bar, however, The Mill is not putting its property to any noxious use at all—it is merely using it as a storage facility. The Mill is not engaging in any act that makes the property itself dangerous; the property is already dangerous because it is contaminated with radiation.

**1014**

i.e., regulations that prohibit all economically beneficial use of land. Any limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere in the title itself ... already place[d] upon land ownership.

*Id.* at ——–——, 112 S.Ct. at 2899–900 (citations and footnotes omitted) (emphasis added). The Court's analysis is consistent with the sharp distinction historically drawn between the treatment of real property and personal property. *See Property Tax Administrator v. Production Geophysical,* 860 P.2d 514, 519 (Colo.1993). For example, we apply the statute of frauds to interests in real property but not to interests in personal property (§ 38–10–108, 16A C.R.S. (1963)) and specific performance is generally directed in contracts concerning the sale of land but not in contracts concerning personal property. *See, e.g., Atchison v. City of Englewood,* 193 Colo. 367, 568 P.2d 13 (1977); *Radetsky v. Palmer,* 70 Colo. 146, 199 P. 490 (1921). The basis for drawing such a distinction is that every parcel of real property is unique. *See Mt. Sneffels Co. v. Estate of Scott,* 789 P.2d 464, 466 (Colo.App.1989). Hence, when the property interest is that associated with the ownership of land, as opposed to personalty, our takings analysis must be guided by the landowner's understandings regarding the bundle of rights he or she acquires with the title to the property. *Lucas,* —— U.S. at ——, 112 S.Ct. at 2899. To the contrary, here, the majority assumes that the existence of a comprehensive regulatory scheme requires that we impute to land owners at the time of purchase, today's knowledge of the harm caused by radiation. Such owner expectations are unreasonable years before the effects of radiation are fully understood; the majority's position does not comport with our previous treatment of owner expectations. The inconsistency of the majority's position is reflected by its statement in footnote 4. Maj. op. at 1000 n. 4.[22]

There have been three important cases decided in this jurisdiction which deal with the concept of owner expectations. *See Ford Leasing v. Board of County Comm'rs,* 186 Colo. 418, 528 P.2d 237 (1974); *Nopro Co. v. Cherry Hills Village,* 180 Colo. 217, 504 P.2d 344 (1972); *Gold Run, Ltd. v. Board of County Comm'rs,* 38 Colo.App. 44, 554 P.2d 317 (1976). In each of these three cases, the harm was self-inflicted. For example, in *Nopro,* a zoning case, the court held "Nopro's land investment was made in full knowledge of the zoning limitations. It took the calculated risk that it could break the zoning use barrier and thereby double the profit from its investment." *Nopro,* 180 Colo. at 227, 504 P.2d at 349. The court concluded "if hardship exists ... it was incurred voluntarily by the choice of Nopro and was self-inflicted." *Id.* Likewise, in *Ford Leasing* and *Gold Run,* the court emphasized the fact that the owner bought the property having full knowledge of existing restrictive zoning, thus rendering a hardship self-inflicting.

In this case, the majority asserts that The Mill was on notice that the radioactive materials present on the property were highly regulated at both the state and federal level, stating "the facts stipulated to by the parties in the regulatory taking action indicated that the entire property, including the mill yard, had been subject to federal licensing and regulation since 1962 due to the presence of radioactive contamination." Maj. op. at 1000. The majority maintains that even in 1973, when The Mill purchased the lot, there "existed an awareness that the hazards posed by radiation were potentially severe." *Id.* The majority's observation fails to fairly take into account two important realities: (1) in 1973, the extent of the potential hazards posed by radiation was not fully understood; and (2) The Mill had no knowledge of the site's

---

22. The majority asserts that "expectations of unregulated use are unreasonable when an extensive regulatory scheme is in place at the time of the investment." Maj. op. at 1000. The picture drawn by the majority is no different, however, from a situation in which property is acquired for permissible use under existing zoning ordinances and is subsequently "taken" by a change of zoning ordinances within the existing regula-

tory scheme. Yet it is undisputed that in that situation compensation is required. *See, e.g., Cottonwood Farms v. Board of County Comm'rs of Jefferson County,* 725 P.2d 57, 60 (Colo.App. 1986); *see also Gold Run, Ltd. v. Board of County Comm'rs,* 38 Colo.App. 44, 46, 554 P.2d 317, 319 (1976) (when zoning is confiscatory it rises to a "taking" of private property requiring compensation).

contamination at the time of its purchase due to its reliance upon CDH findings that the mill yard was uncontaminated and available for uses contemplated by The Mill.[23] These and other facts found by the trial court cannot be ignored. Where the findings of the trial court are supported by the record, those findings must be accepted on review unless they are clearly erroneous. *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1384 (Colo. 1994). Because we have consistently disapproved of the substitution of new factual findings by reviewing courts for those made by the trial court, *Page v. Clark*, 197 Colo. 306, 313, 592 P.2d 792, 796 (1979), and because the record clearly supports the findings of the trial court, it would be inappropriate on review to fail to take such facts into consideration.

The facts of this case deal with what was described during the trial as "a regulatory framework which has evolved over time to deal with our increase in knowledge of radiation and its dangers." As found by the trial court, the need to clean up areas such as the Gunnison uranium mill site was not "an overriding concern" in the early 1970's. Testimony shows that in 1971, cleanup efforts were done related to buildings and equipment, with an emphasis at that time on alpha contaminations. That same testimony indicates that since 1971, concerns have grown for other types of radiation contamination, including radon contamination, radon progeny called radon daughters and gamma radiation. Although there were proper tools and equipment for testing for these types of other radiation problems in 1971, there was not a sufficient concern at that time for the dangers from these other radiation hazards. Thus, they were not part of the examination that was done prior to the delicensure in 1971. In fact, testimony indicated that in 1971, when the property in question was removed from licensure, CDH did not even consider it important enough to regulate the tailings pile, let alone the mill yard. Today, on the other hand, according to testimony

which was introduced at trial, radiation is considered potentially harmful in any degree.

Before purchasing the property in 1973, The Mill fully researched the possibility of contamination on that site by reviewing CDH files in February of 1973. The Mill found that the site had been regulated at one time, but that the state had delicensed the parcel, representing that it was not contaminated, and authorizing its *unrestricted* use. After regulatory examination, the state demonstrated its approval of the storage use contemplated by The Mill, as well as any other reasonable uses. The record reflects that The Mill purchased the property based on an expectation created by the government. Given the fact that "scientific knowledge concerning the hazards of radiation was not as sophisticated as it is now," maj. op. at 1000, the state's representations were conceivable. It follows that The Mill's reliance on those representations was reasonable. Thus, in 1973, despite the fact that the mill yard remained subject to federal regulation, The Mill's contemplated use of the property for storage, a use also contemplated by government officials after regulatory examination, was reasonable.

It is not disputed that the mill yard is contaminated and should be regulated by the state. The issue comes down to who should bear the cost of the government's intervention—the state or the private party. When a citizen relies on government records and the government later changes its position, the only logical solution is for the government to bear any costs involved.

### IV

I would therefore find that the investment-backed expectations of The Mill based upon information from CDH were not highly unreasonable. Since the trial court's findings with respect to the remaining material facts are supported by the record, I would find a potentially compensable taking requiring that we determine issues not reached by the ma-

**23.** The trial court held that The Mill "knew there had been a uranium mill on that site; and knew what was still there; that is to say, the tailings pile. The [Mill] did not know, at the time that it purchased, that there was radioactive contamination on the mill site itself." This finding is supported by the record.

jority. For the foregoing reasons, I respectfully dissent.